**COMMODITY FUTURES TRADING COMMISSION, Plaintiff–Appellee,**

v.

**William C. DUNN and Delta Consultants, Inc., Defendants–Appellants,**

**Delta Options, Ltd. and Nopkine Co., Ltd., Defendants.**

**No. 856, Docket 94–6197.**

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1994.

Decided June 23, 1995.

interest of justice, transfer such case to any district or division in which it could have been brought.

Gary D. Stumpp, Stumpp & Mandaville, New York City (Adam M. Bond, Stumpp & Mandaville, New York City, of counsel), for defendants-appellants.

David R. Merrill, Deputy Gen. Counsel, Commodity Futures Trading Com'n, Washington, DC (Pat G. Nicolette, Acting Gen. Counsel, Jay L. Witkin, Deputy Gen. Counsel, Jeffrey S. Holik, Asst. Gen. Counsel, Gracemary R. Moleski, Attorney, Commodity Futures Trading Com'n, Washington, DC of counsel), for plaintiff-appellee.

David Yeres, John M. Quitmeyer, Rogers & Wells, New York City, for amicus curiae, Credit Lyonnais, Danforth Newcomb, Shearman & Sterling, New York City, for amicus curiae Bank Julius Baer & Co. Ltd., Kent T. Stauffer, Judah A. Shechter, New York City, for amicus curiae The Chase Manhattan Bank, N.A.

James M. Kenny, Kenny & Stearns, New York City (John G. Gaine, Gen. Counsel, Managed Futures Ass'n, Barbara Wierzynski, Gen. Counsel, Futures Industry Ass'n, Inc., J. Paula Pierce, David M. Kozak, Kenny & Stearns, New York City, of counsel), for amici curiae Managed Futures Ass'n and Futures Industry Ass'n, Inc.

Richard H. Klapper, Sullivan & Cromwell, New York City (Kenneth M. Raisler, Timothy J. Helwick, John T. Corcoran, Sullivan & Cromwell, New York City, of counsel), for amici curiae The Foreign Exchange Committee and the New York Clearing House Ass'n.

Before: WINTER, JACOBS, and CABRANES, Circuit Judges.

WINTER, Circuit Judge:

This is an interlocutory appeal from the appointment of a temporary receiver. The principal legal issue is whether the Commodity Futures Trading Commission ("CFTC") has power to regulate off-exchange options involving foreign currencies. Based on a prior decision of this court binding on this panel, we hold that it does and affirm.

## BACKGROUND

This is an action by the Commodity Futures Trading Commission against four defendants: (i) William C. Dunn, an individual and the president and sole shareholder of Delta Consultants; (ii) Delta Consultants, a New Jersey corporation formed by Dunn in 1974; (iii) Delta Options, Ltd., an investment company incorporated in the Bahamas in 1991, to which Dunn is an advisor and of which he was managing director; and (iv) Nopkine Co., Ltd., an investment company incorporated in the British Virgin Islands in 1993, to which Dunn is an advisor.

Beginning in 1992, some of the defendants solicited investments from a number of individuals, partnerships, and companies. These investors understood that Delta Options would use the money to execute investment strategies involving the purchase and sale of call and put options on various foreign currencies. Through these trades, various combinations of sales and purchases of different forms of options created relatively exotic positions in foreign currencies, including "strangles" and "boxes." These trades were done in the name of defendants, and no participations or options were sold directly to investors.

The defendants' trading took place in the so-called off-exchange market. Such trading is over-the-counter and not conducted on any kind of organized exchange. Rather, the market consists of myriad and interlocking contracts struck over the telephone between dealers and through brokers.

According to affidavits submitted by the CFTC, Dunn and his agents, including A.P.

Black Limited, an English firm, disseminated false information concerning the risks and rewards of currency trading in general and of investing with defendants in particular. Investors were also deceived as to the success of defendants' trading and the status of the investors' accounts.

Investors in Delta Options received weekly print-outs summarizing the putative current market value of their particular positions. Until late 1993, these print-outs apparently showed impressive returns on the investments. When options expire, the positions are said to "mature." Prior to the maturity of an investor's position, Delta Options would ask the investor whether the investor wanted to "roll over" the positions or to cash out. By "rolling over" the positions, the investor would reinvest those funds with defendants. Some investors—including those constituting the partnership of Nobad Investment Currency ("Nobad")—claim that misleading print-outs caused them to "roll over" their investments instead of withdrawing them.

The scheme began to unravel in the second half of 1993, and investors began to receive curious communications from defendants. For instance, in early July 1993, investors received a letter from Delta Options to the effect that the "Investment Management Regulatory Organisation Limited," a British regulatory organization, was investigating A.P. Black Limited. In late July 1993, one investor—an English ship repair agency business named Carlden Marine and Industrial Agencies Limited ("Carlden Marine")— was informed by a letter from Delta Options that it would be repaid in full at the next contract maturity dates. Carlden Marine was thus assured that it would be "cashed out" as its positions matured. Over the next two months, however, the monies were not released as anticipated. Funds representing the positions that supposedly matured on August 27, 1993 were sent to Carlden Marine in the middle of October.

Notwithstanding communications from Delta Options and Dunn that alternated between vague and placating, Carlden Marine never received funds corresponding to positions maturing on September 27, 1993. On November 26, Carlden Marine received a letter from Delta Consultants stating that Delta Options had suffered trading losses of $85 million. On November 28, Carlden Marine received a similar communication from Delta Options, except that the losses were set at $95 million. Finally, on December 3, 1993, Carlden Marine received a letter from Delta Options that stated that Delta Consultants could not compensate investors for the losses.

Other investors experienced similar difficulties. The Nobad partnership was informed in July through the "Summary Report of Foreign Exchange Option Positions" sent by Delta Consultants that the maturity of some of its currency positions had been extended to late September. They were then informed in late September that the funds representing such matured positions would not be paid out until November. In late November, the Nobad partners, like Carlden Marine, received communications from Delta Options indicating massive losses and an inability to repay their money.

On the present record, it would appear that, whatever their original intent, defendants became engaged in an old-fashioned "Ponzi" scheme, accompanied by exotic financial vocabulary. The weekly print-outs suggested large returns, which convinced most investors to "roll over" their funds. So long as these funds and money from new investors exceeded losses, any investor who wished to "cash out" could be paid off. The losses, however, were too great to be offset by "roll-overs" or new money, and much of the investors' money has disappeared.

At least some money has been transferred to Switzerland. For example, transfer documents from Credit Lyonnais indicate that Delta Options wired $16.5 million from an account in New York to an account in Zurich, Switzerland in July 1993, while documents from Bank Julius Baer reflect a $3 million transfer from a New York account to a Zurich account.

The present lawsuit was commenced by the CFTC on April 5, 1994. On the same date, the CFTC also applied, *ex parte*, for a restraining order, which was promptly entered by the district court, freezing the de-

fendants' assets. On May 4, 1994, the CFTC requested the appointment of a temporary equity receiver. On May 6, the district court held a hearing on this request. Defendants' sole argument at this hearing was that there was no subject matter jurisdiction because the CFTC has no power to regulate options in foreign currency. After a second hearing on June 23, the district court appointed a temporary equity receiver. Appellants brought this interlocutory appeal, along with a motion to stay the order pending appeal. We denied the stay and expedited this appeal.

## DISCUSSION

The CFTC's evidentiary proffer sufficiently demonstrated that defendants deceived investors and caused investors to receive false reports. Such behavior, when undertaken in the course of conduct over which the CFTC has jurisdiction, is unlawful under 7 U.S.C. § 6c(b). The CFTC also has alleged facts sufficient to find Dunn (i) liable for aiding and abetting such violations and (ii) liable for being a controlling person with respect to such violations. *See* 7 U.S.C. § 13c.

The principal question to be addressed, therefore, is whether the CFTC has the power to regulate options in foreign currency. This turns on whether trading in off-exchange options on foreign currencies is excluded from the CFTC's jurisdiction by the language of the 1974 amendments to the Commodities Exchange Act ("CEA"). The Commodity Futures Trading Commission Act of 1974 created the CFTC and gave it extensive power to regulate futures and options. *See* Pub.L. No. 93–463, 88 Stat. 1389, *et seq.* (1974). However, this authority was circumscribed with respect to foreign currency by the "Treasury Amendment" of 1974, which reads:

> Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, unless such transactions involve the sale thereof for future delivery conducted on a board of trade.

7 U.S.C. § 2(ii). The issue is whether or not the phrase "transactions in foreign currency" includes options on foreign currency. If such options are included, then the exemption applies, and the options do not fall within the CFTC's jurisdiction.

This issue is foreclosed by clear precedent in this circuit that holds that the term "transactions in foreign currency" does not include options, even those options traded off-exchange. We addressed this question in *Commodity Futures Trading Commission v. American Board of Trade*, 803 F.2d 1242 (2d Cir.1986), and interpreted "transactions in foreign currency" to exclude options. Our reasoning was that an option was simply the right to engage in a transaction in the future, and, until this right matured, there was no exempt "transaction." The exercise of an option would constitute a "transaction in foreign currency," but the purchase or sale of the option itself would not be such a "transaction" under the Treasury Amendment. *Id.* at 1248–49.

Appellants and *amici* urge that this interpretation was dicta because *American Board of Trade* involved transactions that were nonexempt because they had occurred on an exchange. Therefore, it was not necessary to hold that all options were outside the Treasury Amendment exemption to reach the conclusion that the transactions at issue in *American Board of Trade* fell within the CFTC's jurisdiction.

Appellants and *amici* are correct that we could have altered our reasoning and reached the same result by stating that because the instruments at issue in *American Board of Trade* were traded on an exchange they fell outside the Treasury Amendment. Nevertheless, that was not the path we chose. The fact that a quite different line of reasoning leading to the same result might have been adopted by a prior panel does not give a later panel in this circuit free rein to disregard an earlier decision. When a prior decision makes statements in a line of reasoning that are broader than necessary to the affirmance or reversal of a judgment, a later panel may confine the precedential effect to a narrower

ground within the line of reasoning. However, a later panel may not disregard the reasoning of a decision because an entirely different line of reasoning was available. Whatever doubts this panel may have about the interpretation given the Treasury Amendment in *American Board of Trade,* therefore, are not grounds for our declining to follow it. We acknowledge that our interpretation of the phrase "transactions in foreign currency" in *American Board of Trade* conflicts with that of the Fourth Circuit in *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). This conflict is for the Supreme Court, not us, to resolve.

*Amici* warn of a number of potentially dire effects that could result from a holding that off-exchange currency options fall within the subject matter jurisdiction of the CFTC. These dire effects are to a degree deflected by the CFTC's trade option exemption. *See* 17 C.F.R. § 32.4 (limited exemption for commodity options "offered by a person which has a reasonable basis to believe that the option is offered to a producer, processor, commercial user or merchant ... solely for purposes related to its business as such"). At oral argument, for example, the CFTC represented that the trade option exemption would apply to options in foreign currency traded among banks. In any event, we are bound by precedent.

We have examined appellants' claim that the district court abused its discretion by appointing a temporary receiver. We hold that Judge Griesa's actions were proper and responsible under the circumstances, and appellants' contentions to the contrary are without merit.

Affirmed.