99 F.3d 299
 65 USLW 2336, Comm. Fut. L. Rep. P 26,807,
96 Cal. Daily Op. Serv. 7881,
96 Daily Journal D.A.R. 13,081
 COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellant,
and
Commissioner of Corporations of the State of California, Plaintiff,
v.
FRANKWELL BULLION LIMITED; Frankwell Investment Services
Inc.; Maywell Investment Services, Inc.; Frankwell
Investment Services (Texas) Inc.; Frankwell Management
Service (New York) Inc., Defendants-Appellees.
Thomas Taylor, III, Receiver.
COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellant,
v.
FRANKWELL BULLION LIMITED; Frankwell Investment Services
Inc.; Maywell Investment Services, Inc.; Frankwell
Investment Services (Texas) Inc.; Frankwell Management
Service (New York) Inc., Defendants-Appellees.
 Nos. 95-16977, 95-17298.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 17, 1996.
Decided Oct. 29, 1996.
 
 Jay L. Witkin, Deputy General Counsel, and James T. Kelly, Assistant General Counsel, Commodity Futures Trading Commission, Washington, D.C., for plaintiff-appellant.
 Paul S. Schmidtberger and Gary L. Benton, Coudert Brothers, San Francisco, California, for defendants-appellees.
 Mark D. Young, Kirkland & Ellis, Washington, DC, James T. Malysiak, Freeman, Freeman & Salzman, Chicago, Illinois, and Kenneth M. Raisler, Sullivan & Cromwell, New York City, for amici.
 Appeals from the United States District Court for the Northern District of California, D. Lowell Jensen, District Judge, Presiding. D.C. No. CV-94-02166-DLJ.
 Before: CHOY, CANBY and FERNANDEZ, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 Plaintiff-appellant Commodity Futures Trading Commission ("CFTC") appeals the summary judgment granted in favor of defendant-appellee Frankwell Bullion, Ltd. and its affiliates ("Frankwell"). The district court held that Frankwell was exempted from the jurisdiction of the CFTC by the so-called "Treasury Amendment" to the Commodity Exchange Act ("CEA") because it was not a "board of trade" within the meaning of that amendment. We affirm that ruling of the district court.
 
 
 2
 The CFTC also appeals the district court's imposition of receivership fees upon the CFTC. We affirm that ruling as well.
 
 Factual and Procedural Background
 
 3
 Frankwell Bullion, Ltd., a Hong Kong corporation established in 1987, offers foreign currency transactions to the general U.S. public through several American-based affiliates. Neither Frankwell nor its affiliates have registered with the CFTC nor sought contract market designation. Nor are they subject to the regulatory jurisdiction of the Treasury Department or any federal bank regulatory agency.
 
 
 4
 Frankwell sold standardized lots of various foreign currencies, each worth approximately $100,000. The customer could open either "long" or "short" positions in these currencies at a price based on the interbank spot market in Hong Kong. Frankwell customers came both from cold-call solicitations of the general public and from relatives, friends and neighbors of sales agents.
 
 
 5
 Customers paid "initial margin" for each lot, generally $1000 for a day trade or $2000 for an overnight trade, with additional margin required in the event of adverse market conditions. At no time was the customer required to pay full purchase price for the foreign currency. Customers could satisfy their contractual obligations either by entering into an offsetting transaction or by taking or making delivery of the underlying currency, depending on whether the transaction was a purchase or a sale. Profits or losses depended on the difference between the "spot" price at the time a position was opened and the "spot" price when it was closed. Customers did not expect to actually make delivery of the currencies, nor did Frankwell sales agents indicate that delivery was required.
 
 
 6
 The Frankwell customer agreements did not contain a specific date for liquidation of positions; contracts could be left open for indefinite periods of time. Once a customer established a position, the position would be automatically "rolled-over" to the next day's "spot" price if the customer did not offset or liquidate his position. However, no intervening roll-over transaction was executed, and nothing in the record indicates that any position was formally closed and reestablished. Instead, each position initiated by a customer was closed out only once. Customers paid a carrying charge for each day the contract was left open.
 
 
 7
 On June 20, 1994, the CFTC filed a motion seeking a temporary restraining order and appointment of a temporary receiver. The complaint alleged that from August 22, 1991, Frankwell violated sections 5 and 6 of the Commodity Exchange Act, 7 U.S.C. §§ 1-15 ("CEA"), by improperly engaging in commodities trades in the foreign currency and precious metals markets.[1]
 
 
 8
 On June 21, 1994, the district court granted the temporary restraining order and imposed a receivership ex parte. On July 12, 1994, the district court denied the request for a preliminary injunction. The district court then dissolved the temporary receivership. On August 14, 1995, the district court granted Frankwell's motion for summary judgment. On October 3, 1995 the district court ordered the CFTC to pay seventy-five percent of the receivership costs of $223,241.71.
 
 Analysis
 
 9
 I. CFTC Jurisdiction.
 
 
 10
 The CEA provides that no person shall enter into, or offer to enter into, a transaction involving the sale of a commodity for future delivery, unless it is conducted on or through a "board of trade" designated and regulated by the CFTC as a contract market. 7 U.S.C. § 6.
 
 
 11
 In addition, the 1974 Treasury Amendment exempts certain foreign currency transactions from the CEA: "Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade." 7 U.S.C. § 2(ii). The district court held that regardless of whether foreign currency transactions are futures or spot trades,[2] they are exempted from CFTC jurisdiction because they are not transactions involving sales on a board of trade. We agree.
 
 
 12
 We review a grant of summary judgment de novo. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 13
 A. Is Frankwell a "board of trade"?
 
 
 14
 Frankwell and the CFTC vigorously dispute the meaning of the term "board of trade." The CFTC argues that "board of trade" includes any association selling foreign currency, making the Treasury Amendment very narrow. As a fallback position, the CFTC argues that "board of trade" includes all associations except banks and other sophisticated investors. In other words, it contends that the Treasury Amendment exempts only off-exchange trades between banks and other sophisticates. Frankwell argues, and the district court held, that "transactions conducted on a board of trade" include only on-exchange trades, and thus the Treasury Amendment excludes all off-exchange trades.
 
 
 15
 1. Statutory language.
 
 
 16
 The CEA defines "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity or receiving the same for sale on consignment." 7 U.S.C. § 1a(1).
 
 
 17
 The district court held that the "plain meaning" of "board of trade" was an organization conducting on-exchange trades. CFTC v. Frankwell Bullion Ltd., 904 F.Supp. 1072, 1075 (N.D.Cal.1995). Nowhere in the statute, however, do the terms "on-exchange" or "off-exchange" occur. Instead, the plain meaning is the statutory definition: "any exchange or association ... of persons who are engaged in the business of buying or selling any commodity." 7 U.S.C. § 1a(1) (emphasis added). This definition explicitly includes more than just exchanges. Frankwell admits that this definition of "board of trade" would include Frankwell, as Frankwell is an association of persons engaged in the business of buying or selling foreign currency.
 
 
 18
 The problem with applying the plain meaning of "board of trade," however, is that it renders the Treasury Amendment meaningless. As one court has held,
 
 
 19
 such a broad definition of "board of trade" creates an ambiguity in the meaning of that amendment. That is, given the breadth of meaning of board of trade, the "unless" clause of the amendment threatens to swallow the whole. Almost all transactions in futures contracts could be characterized as occurring on a "board of trade" involving "informal associations of people engaged in the business of buying and selling commodities." Thus, it is appropriate to turn to the purpose of the amendment as revealed in the legislative history to determine the true meaning of the exemption.
 
 
 20
 CFTC v. Standard Forex, Inc., 1993 WL 809966 at * 8 (E.D.N.Y.1993).
 
 
 21
 We therefore resort to the legislative history of the Treasury Amendment.
 
 
 22
 2. Legislative history.
 
 
 23
 In 1974, Congress broadened the reach of the CEA to cover additional commodities. Observing that the CEA would apply to foreign currencies, the Treasury Department sent a letter to the Senate Committee on Agriculture and Forestry suggesting an amendment exempting certain foreign currency transactions. The Treasury Department wrote:
 
 
 24
 We do not believe that either the House of Representatives or your Committee intends the proposed legislation to subject the foreign currency futures trading of banks or other institutions, other than on an organized exchange, to the new regulatory regime.
 
 
 25
 The Department feels strongly that foreign currency futures trading, other than on organized exchanges, should not be regulated by the new agency. Virtually all futures trading in foreign currencies in the United States is carried out through an informal network of banks and dealers. This dealer market, which consists primarily of the large banks, has proved highly efficient in serving the needs of international business in hedging the risks that stem from foreign exchange rate movements. The participants in this market are sophisticated and informed institutions, unlike the participants on organized exchanges, which, in some cases, include individuals and small traders who may need to be protected by some form of government regulation.
 
 
 26
 Where the need for regulation of transactions on other than organized exchanges does exist, this should be done through strengthening existing responsibilities now lodged in the Comptroller of the Currency and the Federal Reserve....
 
 
 27
 Section 201 of H.R. 13113 currently contains broad language that would appear to authorize the new agency to regulate bank foreign currency departments.... Since this definition would encompass foreign currencies, it seems clear that the language of the bill would give the Commission authority to regulate futures trading in foreign currencies by banks. Moreover, the language "or any other board of trade, exchange or market" is sufficiently broad to authorize the Commission to regulate trading in foreign currencies by banks in the over-the-counter market....
 
 
 28
 Accordingly, S. 2837 could be construed to prohibit banks from engaging in futures trading in foreign currencies unless they registered as an exchange with the new Future Exchange Commission and became subject to its regulation....
 
 
 29
 In view of the foregoing, we strongly urge the Committee to amend the proposed legislation to make clear that its provisions would not be applicable to futures trading in foreign currencies or other financial transactions of the nature described above other than on organized exchanges.
 
 
 30
 1974 U.S.C.C.A.N. 5843, 5887-89 (emphasis added, except "organized" on 11th line of 2nd paragraph was already emphasized). The Senate adopted the Treasury's proposed amendment almost verbatim.[3]
 
 
 31
 The Treasury Department's main concern was thus with exempting interbank transactions. However, the Department repeatedly and explicitly described its amendment as excluding all transactions other than on "organized exchanges"; it did not describe its amendment as exempting only interbank transactions. Indeed, it noted that the off-exchange market included "banks and other sophisticated participants." It appears that the Treasury Department intended to draft language exempting the entire off-exchange market, with banks being the primary beneficiaries.
 
 
 32
 The Senate Committee report also combines a focus on bank activities with a repeated description of the amendment as excluding all transactions not on organized exchanges:
 
 
 33
 In addition, the Committee amendment provides that inter-bank trading of foreign currencies and specified financial instruments is not subject to Commission regulation....
 
 
 34
 Also, the Committee included an amendment to clarify that the provisions of the bill are not applicable to trading in foreign currencies and certain enumerated financial instruments unless such trading is conducted on a formally organized futures exchange. A great deal of the trading in foreign currency in the United States is carried out through an informal network of banks and tellers. The Committee believes that this market is more properly supervised by the bank regulatory agencies and that, therefore, regulation under this legislation is unnecessary.
 
 
 35
 Likewise, the Committee believes that regulation by the Commission of transactions in the specified financial instruments ..., which generally are between banks and other sophisticated institutional participants, is unnecessary, unless executed on a formally organized futures exchange.
 
 
 36
 Senate Report No. 93-1131, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5843, 5848, 5863-64 (emphasis added). The Committee Report, like the Treasury Department letter, thus focuses on bank transactions, but describes the amendment as exempting all transactions not executed on a formally organized futures exchange.
 
 
 37
 The legislative history thus indicates that Congress intended the Treasury Amendment to exclude all off-exchange transactions, with banks being the primary beneficiaries of this exemption. Instead of using the terms on-exchange and off-exchange, however, Congress used the term "board of trade," a term which already had a much broader statutory definition.
 
 
 38
 3. Judicial interpretation.
 
 
 39
 No Ninth Circuit case has addressed the reach of the Treasury Amendment. In CFTC v. Co Petro, 680 F.2d 573, 581 (9th Cir.1982) we interpreted "board of trade" in the context of different sections of the CEA, sections 4 and 4h, 7 U.S.C. §§ 6, 6h. Applying the broad, statutory definition of "board of trade," we held that a corporation marketing petroleum futures to the general public through advertisements, seminars and sales agents was a "board of trade":
 
 
 40
 Where Congress has, as here, intentionally and unambiguously drafted a particularly broad definition, it is not our function to undermine that effort. Co Petro clearly was an association of persons engaged in the business of selling commodities (petroleum products) within the plain meaning of the statute defining "board of trade." Where the statutory definition is clear on its face we need not delve into legislative history unless it is brought to our attention "that there is within the legislative history something so probative of the intent of Congress as to require a reevaluation of the meaning of the statutory language."
 
 
 41
 Id. at 581 (citations omitted). If applied to this case, this broad interpretation of "board of trade" would encompass Frankwell, which is an association of persons engaged in the business of selling commodities just like Co Petro.
 
 
 42
 Frankwell argues that Co Petro does not apply because it interprets a different section of the CEA. But nothing in the statute indicates that "board of trade" should have a different meaning for different sections. As discussed above, however, the legislative history indicates that Congress intended a narrower definition of "board of trade" for the Treasury Amendment. Other than our decision in Co Petro, we have not discussed "board of trade," nor have we interpreted the Treasury Amendment.
 
 
 43
 Few cases outside the Ninth Circuit have discussed the meaning of "board of trade." Several cases discuss the breadth of the Treasury Amendment, but most discuss the phrase "transactions in foreign currency" rather than "board of trade."[4]
 
 
 44
 In CFTC v. Standard Forex, the court noted that "[t]he definition of the term 'board of trade' includes both formally organized exchanges and informal associations of persons engaged in the business of buying and selling commodities." 1993 WL 809966 at * 7. The court found the meaning of "board of trade" ambiguous, because the plain meaning of the statutory definition would render the Treasury Amendment meaningless. The court thus examined the legislative history, and found that Congress "intended to exempt only interbank transactions that were already regulated by the banking regulatory agencies." Id. at * 10.
 
 
 45
 We agree with the Standard Forex court that the term "board of trade" is ambiguous, thus necessitating an examination of the legislative history. We interpret that legislative history differently, however; as discussed above, we hold that Congress intended the "transactions conducted on a board of trade" to mean on-exchange trades. To hold, as Standard Forex did, that the Treasury Amendment excludes only transactions between banks and other sophisticated investors would require this court to craft, without any support from the statutory language, some distinction between sophisticated investors and the general public. We hold, as the legislative history indicates, that Congress intended the Treasury Amendment to exempt all off-exchange transactions in foreign currency.
 
 
 46
 Since we find that the legislative history conclusively determines that Congress intended the term "board of trade" in the Treasury Amendment to mean on-exchange, we need not resolve which agency, the CFTC or the Treasury Department, would be entitled to deference were Congressional intent unclear.
 
 
 47
 B. Are futures "transactions in foreign currency?"
 
 
 48
 In their amici brief, the Chicago Mercantile Exchange and the Board of Trade of the City of Chicago argue that futures are not "transactions in" foreign currency, but rather transactions involving foreign currency, and thus are not excluded by the Treasury Amendment. We will not address this argument as it was not raised before the district court. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).
 
 II. Receivership Expenses
 
 49
 The CFTC appeals the district court's October 3, 1995 order, which assessed three-quarters of the $220,000 in receivership fees against the CFTC and one-quarter against Frankwell.
 
 
 50
 Whether the federal government has waived sovereign immunity is a question of law this court reviews de novo. Arford v. United States, 934 F.2d 229, 231 (9th Cir.1991). Assuming sovereign immunity is waived, an appeal of an order imposing costs of a receivership is reviewed for an abuse of discretion. Pioche Mines Consolidated, Inc. v. Dolman, 333 F.2d 257, 276 (9th Cir.1964), cert. denied, 380 U.S. 956, 85 S.Ct. 1082, 13 L.Ed.2d 972 (1965).
 
 
 51
 A. Does sovereign immunity bar the district court from imposing receivership costs upon the CFTC?
 
 
 52
 The CFTC argues that the doctrine of sovereign immunity bars the district court from imposing receivership costs against the CFTC. Money awards may be imposed against the United States only if there has been an express waiver of sovereign immunity. Barry v. Bowen, 884 F.2d 442, 443 (9th Cir.1989). The CFTC argues that no statute authorizes the imposition of receivership fees against the United States. In SEC v. Independence Drilling Corp., 595 F.2d 1006, 1008 (5th Cir.1979), the 5th Circuit held that sovereign immunity, as well as an express statutory prohibition not applicable to this case, prevents the imposition of receivership costs against the SEC. Likewise, the court in CFTC v. Comvest Trading Corp., 481 F.Supp. 438, 442 (D.Mass.1979), noted in dictum that "[t]he CFTC, as an agency of government, may assert an immunity from legal responsibility for providing for costs of receivership."
 
 
 53
 Frankwell responds that receivership costs are taxable as costs under 28 U.S.C. § 2412(a)(1), which provides that "a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States." One court has noted in dictum that "it is possible to tax the costs of a receivership against the government" under § 2412(a). Director of Office of Thrift Supervision v. Lopez, 141 F.R.D. 165, 167 (S.D.Fla.1992).
 
 
 54
 We have not addressed this issue. We have held, however, that the costs of a special master may be taxed against the government under § 2412(a). National Organization for Reform of Marijuana Laws v. Mullen, 828 F.2d 536, 545-46 (9th Cir.1987). We reasoned that "the purpose of section 2412(a) is to cause the United States to pay all costs that could be assessed an ordinary citizen." Id. at 546. "Because a court may assess a private party for master's fees and expenses as costs, the court may also assess the United States for such costs." Id. (citation omitted).
 
 
 55
 The reasoning behind Mullen suggests that receivership costs, like master's fees, may be assessed as costs under § 2412(a). A court may assess a private party for receivership costs, and so a court may also assess the United States for such costs. Cf. id.
 
 
 56
 Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), does not undercut the reasoning behind Mullen. In Crawford, the Court suggested that 28 U.S.C. § 1920 is an exclusive list of the costs that a court may award under Fed.R.Civ.P. 54(d). Id. at 441-42, 107 S.Ct. at 2497-98. Mullen holds, however, not that master's fees are allowed under § 1920, but rather that § 2412(a) allows more costs than just those allowed under § 1920:
 
 
 57
 CAMP argues that 28 U.S.C. § 2412(a) limits costs assessable to the United States to those listed in 28 U.S.C. § 1920. This is incorrect. 28 U.S.C. § 2412(a) states that "a judgment for costs, as enumerated in section 1920 of this title, ... may be awarded to the prevailing party in any civil action brought by or against the United States." This language is not explicitly exclusive. Moreover, the legislative history indicates that the purpose of section 2412(a) is to cause the United States to pay all costs that could be assessed an ordinary citizen.
 
 
 58
 Mullen, 828 F.2d at 545-46 (alteration in original). Mullen thus holds that § 2412(a) authorizes any costs that could be assessed against an ordinary citizen. Those costs need not be authorized by § 1920 or Rule 54(d), since the authority for master's fees comes from Rule 53, not Rule 54(d). Neither party disputes that receivership costs are assessable against an ordinary citizen under traditional receivership practice as authorized by Rule 66. The reasoning of Mullen thus dictates that § 2412(a) allows a court to assess receivership costs against the United States.[5]
 
 
 59
 Other courts, although not explicitly discussing sovereign immunity, agree that a district court has discretion to award receivership costs against the United States. See, e.g., Little Earth of United Tribes, Inc. v. HUD, 807 F.2d 1433, 1442 (8th Cir.1986) ("After submitting itself to the court's equitable authority [by requesting a receiver], HUD cannot successfully contend that the district court was powerless to direct the terms of the receivership."); Donovan v. Robbins, 588 F.Supp. 1268, 1271 (N.D.Ill.1984) (holding, when the Secretary of Labor was a party, that "[i]t is up to the discretion of the court appointing the receiver as to who shall be charged with the costs of the receivership").
 
 
 60
 B. Did the district court abuse its discretion in assessing receivership costs against the CFTC?
 
 
 61
 The parties agree that a district court's award of receivership costs is reviewed for abuse of discretion.
 
 
 62
 The CFTC argues that imposition of costs against it is inappropriate because it acted in good faith. It cites to Pioche Mines, where we held that "[t]he court has a discretion to charge the receiver's expenses either to the corporation or to the party who wrongfully obtained the receiver's appointment." 333 F.2d at 276 (emphasis added). The CFTC argues that since it requested the receivership in good faith, it did not wrongfully obtain the receivership.
 
 
 63
 The CFTC misinterprets the meaning of "wrongfully obtained." It means that the receivership was improper, not that the party requested the receivership in bad faith. In Pioche Mines, we found that the party requesting the receiver acted in "good faith," but nonetheless split the receivership costs between the corporation and the requesting party. Id. In fact, Pioche Mines endorsed the same cost-splitting method which the district court used here:
 
 
 64
 [T]hose costs of the receivership that would not have arisen but for the appointment should be charged against the party invoking the receivership, here the appellees. On the other hand, expenses that the corporation would have had to incur had there been no receiver, and expenses that confer a genuine benefit upon the corporation, should be charged to it.
 
 
 65
 Id.
 
 
 66
 In Pioche Mines we relied on W.F. Potts Son & Co. v. Cochrane, 59 F.2d 375, 378 (5th Cir.1932). W.F. Potts, consistently with Pioche Mines and the district court here, held that when the party requesting the receivership had "no malice nor wrongful purpose," the plaintiff requesting the receivership may be charged with those expenses which would not have otherwise been incurred and which did not benefit the fund. Id.
 
 
 67
 Because Pioche Mines approves of the cost-allocation method which the district court adopted, the district court did not abuse its discretion in allocating seventy-five percent of the receivership costs to the CFTC.
 
 Conclusion
 
 68
 We AFFIRM the holding of the district court. Frankwell is entitled to its costs on appeal. Because we conclude that the position of the United States in litigating this question of first impression was substantially justified, we decline to award Frankwell attorneys' fees. See 28 U.S.C. § 2812(d). CFTC's motion to supplement the record by taking judicial notice of briefs filed in the Supreme Court in CFTC v. Dunn, 58 F.3d 50, 53 (2d Cir.1995), cert. granted, --- U.S. ----, 116 S.Ct. 1846, 134 L.Ed.2d 947 (1996), is denied.
 
 
 
 [1]
 The CFTC has not raised the claim regarding precious metals markets in this appeal
 
 
 [2]
 "The 'spot market' is essentially the current market, as distinguished from the futures market. Spot transactions in foreign currencies call for settlement within two days." Bank Brussels Lambert, S.A. v. Intermetals Corp., 779 F.Supp. 741, 742 (S.D.N.Y.1991)
 
 
 [3]
 "Puts and calls" were deleted from the list of exempted securities
 
 
 [4]
 See, e.g., Salomon Forex, Inc. v. Tauber, 8 F.3d 966, 973 n. 5 (4th Cir.1993), cert. denied, 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994) (declining to address the issue of whether Salomon Forex is a "board of trade"); see also CFTC v. American Bd. of Trade, Inc., 803 F.2d 1242, 1249 (2d Cir.1986) (interpreting "transactions in foreign currency" to exclude only banks and other sophisticated investors); Board of Trade v. SEC, 677 F.2d 1137, 1154 (7th Cir.), vacated as moot, 459 U.S. 1026, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982) (same); CFTC v. Sterling Capital Co., Comm.Fut.L.Rep. (CCH) p 21,169 at 24,784 (N.D.Ga.1981) (same)
 In CFTC v. Dunn, the Second Circuit seemed in dictum to interpret "board of trade" to mean on-exchange. 58 F.3d 50, 53 (2d Cir.1995), cert. granted, --- U.S. ----, 116 S.Ct. 1846, 134 L.Ed.2d 947 (1996). In Dunn, the court held that "transactions in foreign currency" did not include options, citing to CFTC v. American Bd. of Trade, 803 F.2d at 1248 (2d Cir.1986). American Bd. of Trade did not address the meaning of "board of trade," as it did not reach the "unless" clause. 803 F.2d at 1248. The Dunn court noted that American Bd. of Trade could have reached the same result "by stating that because the instruments at issue in American Board of Trade were traded on an exchange they fell outside the Treasury Amendment." 58 F.3d at 53. Although the Dunn court nowhere explained where it derived this on-exchange, off-exchange distinction, it may have assumed that "board of trade" included only on-exchange transactions.
 
 
 [5]
 Frankwell also argues that the CFTC waived its sovereign immunity argument by not raising it before the district court. This argument lacks merit; an official cannot waive sovereign immunity by failing to object to a court's jurisdiction. United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 513, 60 S.Ct. 653, 656-57, 84 L.Ed. 894 (1940)