DUNN ET AL. *v.* COMMODITY FUTURES TRADING
COMMISSION ET AL.

No. 95–1181.   Argued November 13, 1996—Decided February 25, 1997

*Gary D. Stumpp* argued the cause for petitioners. With him on the briefs was *Adam M. Bond.*

*Jeffrey P. Minear* argued the cause for respondents. With him on the brief for respondent Commodity Futures Trading Commission were *Acting Solicitor General Dellinger, Deputy Solicitor General Kneedler, Pat G. Nicolette, Jay L. Witkin,* and *Gracemary Rizzo.**

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether Congress has authorized the Commodity Futures Trading Commission (CFTC or

---

*Briefs of *amici curiae* urging reversal were filed for Crédit Lyonnais et al. by *John M. Quitmeyer, Danforth Newcomb, Kent T. Stauffer,* and *David M. Lindley;* and for the Foreign Exchange Committee et al. by *Kenneth M. Raisler, Edward J. Rosen, Peter Buscemi,* and *Maris M. Rodgon.*

Briefs of *amici curiae* urging affirmance were filed for the Board of Trade of the City of Chicago by *Kenneth W. Starr, Mark D. Young,* and *Richard A. Cordray;* and for the Chicago Mercantile Exchange by *Jerrold E. Salzman* and *James T. Malysiak.*

Commission) to regulate "off-exchange" trading in options to buy or sell foreign currency.

## I

The CFTC brought this action in 1994, alleging that, beginning in 1992, petitioners solicited investments in and operated a fraudulent scheme in violation of the Commodity Exchange Act (CEA), 7 U. S. C. § 1 *et seq.*, and CFTC regulations.[1] App. 10. See 7 U. S. C. § 6c(b); 17 CFR § 32.9 (1996).[2] The CFTC's complaint, affidavits, and declarations submitted to the District Court indicate that customers were told their funds would be invested using complex strategies involving options to purchase or sell various foreign currencies. App. 8. Petitioners apparently did in fact engage in many such transactions. *Ibid.;* 58 F. 3d 50, 51 (CA2 1995). To do so, they contracted directly with international banks and others without making use of any regulated exchange or board of trade. In the parlance of the business, petitioners traded in the "off-exchange" or "over-

---

[1] The complaint names as defendants William C. Dunn, Delta Consultants, Inc., Delta Options, Ltd., and Nopkine Co., Ltd. App. 6–7. Only Dunn and Delta Consultants are petitioners here.

[2] The statute provides: "No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an 'option' . . . contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe." 7 U. S. C. § 6c(b). The regulations at issue here further make it unlawful "for any person directly or indirectly . . . [t]o cheat or defraud or attempt to cheat or defraud any other person; . . . [t]o make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; . . . [or] [t]o deceive or attempt to deceive any other person by any means whatsoever . . . in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction." 17 CFR § 32.9 (1996).

the-counter" (OTC) market.[3]  *Ibid.*  No options were ever sold directly to petitioners' customers.  However, their positions were tracked through internal accounts, and investors were provided weekly reports showing the putative status of their holdings.  Petitioners and their customers suffered heavy losses.  *Id.*, at 51–52.  Subsequently, the CFTC commenced these proceedings.

Rejecting petitioners' defense that off-exchange transactions in foreign currency options are exempt from the CEA, the District Court appointed a temporary receiver to take control of their property for the benefit of their customers.  App. to Pet. for Cert. 5b–6b.  Relying on Circuit precedent,[4] and acknowledging a conflict with another Circuit,[5] the Court of Appeals affirmed.  58 F. 3d, at 54.  We granted certiorari to resolve the conflict.  517 U. S. 1219 (1996).  For the reasons that follow, we reverse and remand for further proceedings.

## II

The outcome of this case is dictated by the so-called "Treasury Amendment" to the CEA.  88 Stat. 1395, 7 U. S. C. § 2(ii).  We have previously reviewed the history of the CEA and generally described how it authorizes the CFTC to regulate the "volatile and esoteric" market in

---

[3] We are informed by *amici* that participants in the "highly evolved, sophisticated" OTC foreign currency markets include "commercial and investment banks, . . . foreign exchange dealers and brokerage companies, corporations, money managers (including pension, mutual fund and commodity pool managers), commodity trading advisors, insurance companies, governments and central banks."  Brief for Foreign Exchange Committee et al. as *Amici Curiae* 8.  These markets serve a variety of functions, including providing ready access to foreign currency for international transactions, and allowing businesses to hedge against the risk of exchange rate movements.  *Id.*, at 8–9.

[4] 58 F. 3d 50, 53 (CA2 1995) (citing *Commodity Futures Trading Comm'n* v. *American Bd. of Trade*, 803 F. 2d 1242 (CA2 1986)).

[5] 58 F. 3d, at 54 (citing *Salomon Forex, Inc.* v. *Tauber*, 8 F. 3d 966 (CA4 1993), cert. denied, 511 U. S. 1031 (1994)).

futures contracts in fungible commodities. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 356, 357–367 (1982). As a part of the 1974 amendments that created the CFTC and dramatically expanded the coverage of the statute to include nonagricultural commodities "in which contracts for future delivery are presently or in the future dealt in," see 88 Stat. 1395, 7 U. S. C. § 2 (1970 ed., Supp. IV), Congress enacted the following exemption, which has come to be known as the "Treasury Amendment":

> "Nothing in this chapter shall be deemed to govern or in any way be applicable to *transactions in foreign currency*, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, unless such transactions involve the sale thereof for future delivery conducted on a board of trade." 7 U. S. C. § 2(ii) (emphasis added).

The narrow issue that we must decide is whether the italicized phrase ("transactions in foreign currency") includes transactions in options to buy or sell foreign currency. An option, as the term is understood in the trade, is a transaction in which the buyer purchases from the seller for consideration the right, but not the obligation, to buy or sell an agreed amount of a commodity at a set rate at any time prior to the option's expiration.[6] We think it plain that foreign currency options are "transactions in foreign currency" within the meaning of the statute. We are not persuaded

---

[6] See G. Munn & F. Garcia, Encyclopedia of Banking and Finance 736 (8th ed. 1983) (hereinafter Munn & Garcia); C. Luca, Trading in the Global Currency Markets 243 (1995) (hereinafter Luca). Participants in these markets refer to an option that provides the right to sell currency as a "put," and one that provides the right to buy as a "call." Munn & Garcia 737; Luca 270, 272. Options can themselves be traded, at values that vary depending upon the exchange rate of the underlying currencies prior to the option's expiration. Brief for Foreign Exchange Committee et al. as *Amici Curiae* 5, n. 5.

by any of the arguments advanced by the CFTC in support of a narrower reading that would exempt futures contracts (agreements to buy or sell a specified quantity of a commodity at a particular price for delivery at a set future date)[7] without exempting options.

## III

"[A]bsent any 'indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it.'" *Hubbard* v. *United States*, 514 U. S. 695, 703 (1995) (quoting *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 570 (1994) (SOUTER, J., dissenting)). The CFTC argues, and the Court of Appeals held, that an option is not itself a transaction "in" foreign currency, but rather is just a contract right to engage in such a transaction at a future date. Brief for CFTC 30–31; 58 F. 3d, at 53. Hence, the Commission submits that the term "transactions in foreign currency" includes only the "actual exercise of an option (*i. e.*, the actual purchase or sale of foreign currency)" but not the purchase or sale of an option itself. Brief for CFTC 31. That reading of the text seems quite unnatural to us, and we decline to adopt it.

The more normal reading of the key phrase encompasses all transactions in which foreign currency is the fungible good whose fluctuating market price provides the motive for trading. The CFTC's interpretation violates the ordinary meaning of the key word "in," which is usually thought to be "synonymous with [the] expressions 'in regard to,' 'respecting,' [and] 'with respect to.'" Black's Law Dictionary 758 (6th ed. 1990); see *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.*, 515 U. S. 687, 697–698 (1995). There can be no question that the purchase or sale of a foreign

---

[7] See Munn & Garcia 414; City of New York Bar Association Committee on Futures Regulation, The Evolving Regulatory Framework for Foreign Currency Trading 9 (1986).

currency option is a transaction "respecting" foreign currency. We think it equally plain as a matter of ordinary meaning that such an option is a transaction "in" foreign currency for purposes of the Treasury Amendment.

Indeed, adopting the Commission's reading would deprive the exemption of the principal effect Congress intended. The CFTC acknowledges that futures contracts fall squarely within the Treasury Amendment's exemption, Brief for CFTC 30, and there is no question that the exemption of off-exchange foreign currency futures from CFTC regulation was one of Congress' primary goals.[8] Yet on the CFTC's reasoning the exemption's application to futures contracts could not be sustained.

A futures contract is no more a transaction "in" foreign currency as the Commission understands the term than an option. The Commission argues that because a futures contract creates a legal obligation to purchase or sell currency on a particular date, it is somehow more clearly a transaction "in" the underlying currencies than an option, which generates only the right to engage in a transaction. *Id.*, at 30–32. This reasoning is wholly unpersuasive. No currency changes hands at the time a futures contract is made. And,

---

[8] The amendment was enacted on the suggestion of the Treasury Department at the time of a dramatic expansion in the scope of federal commodities regulation. The Department expressed concerns in a letter to the relevant congressional committee that this development might lead, *inter alia*, to the unintended regulation of the off-exchange market in foreign currency futures. See S. Rep. No. 93–1131, pp. 49–50 (1974) ("The Department feels strongly that foreign currency futures trading, other than on organized exchanges, should not be regulated by the new agency") (letter of Donald Ritger, Acting General Counsel). The Treasury Amendment, which tracks almost verbatim the language proposed by the Department, cf. *id.*, at 51, was included in the legislation to respond to these concerns. *Id.*, at 23. The CFTC is therefore plainly correct to reject the suggestion of its *amici* that the Treasury Amendment's exemption be construed not to include futures contracts within its coverage. See Brief for Chicago Mercantile Exchange as *Amicus Curiae* 17–18; Brief for Board of Trade of City of Chicago as *Amicus Curiae* 10.

the existence of a futures contract does not guarantee that currency will actually be exchanged. Indeed, the Commission concedes that, in most cases, futures contracts are "extinguished before delivery by entry into an offsetting futures contract." *Id.*, at 30 (citing 1 T. Snider, Regulation of the Commodities Futures and Options Markets § 2.05 (2d ed. 1995) (hereinafter Snider)); see also Munn & Garcia 414. Adopting the CFTC's reading would therefore place both futures and options outside the exemption, in clear contravention of Congress' intent.

Furthermore, this interpretation would leave the Treasury Amendment's exemption for "transactions in foreign currency" without any significant effect at all, because it would limit the scope of the exemption to "forward contracts" (agreements that anticipate the actual delivery of a commodity on a specified future date) and "spot transactions" (agreements for purchase and sale of commodities that anticipate near-term delivery).[9] Both are transactions "in" a commodity as the CFTC would have us understand the term. But neither type of transaction for *any* commodity was subject to intensive regulation under the CEA at the time of the Treasury Amendment's passage. See 7 U. S. C. § 2 (1970 ed., Supp. IV) ("term 'future delivery,' as used in this chapter, shall not include any sale of any cash commodity for deferred shipment or delivery"); Snider § 9.01; J. Markham, The History of Commodity Futures Trading and Its Regulation 201–203 (1987). Our reading of the exemption is therefore also consonant with the doctrine that legislative enactments should not be construed to render their provisions mere surplusage. See *Babbitt*, 515 U. S., at 698 (noting "reluctance to treat statutory terms as surplusage"); *Mountain States Telephone & Telegraph Co.* v. *Pueblo of Santa Ana*, 472 U. S. 237, 249 (1985).

---

[9] See Snider § 9.01 (defining "spot transactions" and "forward contracts").

Finally, including options in the exemption is consistent with Congress' purpose in enacting the Treasury Amendment. Although at the time the Treasury Amendment was drafted a thriving off-exchange market in foreign currency futures was in place, the closely related options market at issue here had not yet developed. See City of New York Bar Association Committee on Futures Regulation, The Evolving Regulatory Framework for Foreign Currency Trading 18, 23 (1986). The CFTC therefore suggests that Congress could not have intended to exempt foreign currency options from the CEA's coverage. Brief for CFTC 41–42. The legislative history strongly suggests to the contrary that Congress' broad purpose in enacting the Treasury Amendment was to provide a general exemption from CFTC regulation for sophisticated off-exchange foreign currency trading, which had previously developed entirely free from supervision under the commodities laws.

In explaining the Treasury Amendment, the Senate Committee Report notes in broad terms that the amendment "provides that inter-bank trading of foreign currencies and specified financial instruments is not subject to Commission regulation." S. Rep. No. 93–1131, p. 6 (1974).[10] Elsewhere, the Report again explains in general terms—without making reference to any distinction between options and futures—that the legislation

> "included an amendment to clarify that the provisions of the bill are not applicable to trading in foreign currencies and certain enumerated financial instruments unless such trading is conducted on a formally organized futures exchange. A great deal of the trading in foreign currency in the United States is carried out through an informal network of banks and tellers. The Committee

---

[10] Similarly, the Conference Committee Report points out that the Treasury Amendment "provides that interbank trading of foreign currencies and specified financial instruments is not subject to Commission regulation." H. R. Conf. Rep. No. 93–1383, p. 35 (1974).

believes that this market is more properly supervised by the bank regulatory agencies and that, therefore, regulation under this legislation is unnecessary." *Id.*, at 23.

Similarly, the Treasury Department submitted to the Chairman of the relevant Senate Committee a letter that was the original source of the Treasury Amendment. While focusing on the need to exempt the foreign currency futures market from CFTC regulation, the letter points out that the "participants in this market are sophisticated and informed institutions," and "the [CFTC] would clearly not have the expertise to regulate a complex banking function and would confuse an already highly regulated business sector." *Id.*, at 50 (letter of Donald Ritger, Acting General Counsel). The Department further explained that "new regulatory limitations and restrictions could have an adverse impact on the usefulness and efficiency of foreign exchange markets for traders and investors." *Ibid.*

Although the OTC market for foreign currency options had not yet developed in 1974, the reasons underlying the Treasury Department's express desire at that time to exempt off-exchange commodity futures trading from CFTC regulation apply with equal force to options today. Foreign currency options and futures are now traded in the same off-exchange markets, by the same entities, for quite similar purposes. See Brief for Foreign Exchange Committee et al. as *Amici Curiae* 19. Contrary to the Commission's suggestion, we therefore think the purposes underlying the Treasury Amendment are most properly fulfilled by giving effect to the plain meaning of the language as Congress enacted it.

The CFTC rejoins that the Treasury Amendment should be construed in the light of Congress' history of regulating options more strictly than futures. See Snider §§ 7.03–7.04; Brief for CFTC 38–39. The Commission submits that this distinction was motivated by the view that options lend

themselves more readily to fraudulent schemes than futures contracts. Hence, the CFTC argues that Congress would have acted reasonably and consistently with prior practice had it regulated commodities differently from options. While that may be true, we give only slight credence to these general historical considerations, which are unsupported by statutory language, or any evidence evocative of the particular concerns focused on by the legislators who enacted the Treasury Amendment. We think the history of the Treasury Amendment suggests—contrary to the CFTC's view—that it was intended to take all transactions relating to foreign currency not conducted on a board of trade outside of the CEA's ambit. This interpretation is consistent with the fact that, prior to the enactment of the CEA in 1974, foreign currency trading had been entirely unregulated under the commodities laws.

Our interpretation is also consonant with the history of evolving congressional regulation in this area. That history has been one of successively broadening the coverage of regulation by the addition of more and more commodities to the applicable legislation.[11] It seems quite natural in this context to read the Treasury Amendment's exemption of trans-

---

[11] The Grain Futures Act, enacted by Congress in 1922 to authorize the Secretary of Agriculture to supervise trading in grain futures on "contract markets," defined the regulated commodities to include "wheat, corn, oats, barley, rye, flax, and sorghum." 42 Stat. 998. In 1936 Congress expanded the coverage of the legislation to add further agricultural commodities, including cotton, rice, butter, eggs, and Irish potatoes. Ch. 545, 49 Stat. 1491. (The contrast between the title of the 1936 Act—"Commodity Exchange Act"—and the title of its predecessor—"Grain Futures Act"—suggests that an easy way to describe the coverage of the legislation is to identify the commodities that it regulates.) In 1968 the coverage of the legislation was again expanded, this time to include livestock and livestock products. 82 Stat. 26. The 1974 amendment expanded the coverage of the statute to include nonagricultural commodities and, appropriately, replaced regulation by the Secretary of Agriculture with regulation by a new commission whose title included the word "Commodity."

actions in foreign currencies as a complete exclusion of that commodity from the regulatory scheme, except, of course, to the extent that the proviso for transactions "conducted on a board of trade" qualifies that exclusion. See 7 U. S. C. § 2(ii).

## IV

To buttress its reading of the statute, the CFTC argues that elsewhere in the CEA Congress referred to transactions "involving" a particular commodity to describe options or used other "more encompassing terminology," rather than what we are told is the narrower term transactions "in" the commodity, which was reserved for futures, spot transactions, and forward contracts. Brief for CFTC 30–33. Not only do we think it unlikely that Congress would adopt such a subtle method of drawing important distinctions, there is little to suggest that it did so.

Congress' use of these terms has been far from consistent. Most strikingly, the use of the word "involving" in the Treasury Amendment itself completely eviscerates the force of the Commission's argument. After setting forth exemptions for, *inter alia*, "transactions in foreign currency," the amendment contains a proviso sweeping back into the statute's coverage "such transactions *involv[ing]* the sale thereof for future delivery conducted on a board of trade." 7 U. S. C. § 2(ii) (emphasis added). As we have already noted, the CFTC agrees that futures contracts are a subset of "transactions in foreign currency." The Commission further submits that the proviso uses the word "involve" to make the exemption inapplicable to those futures contracts that are conducted on a board of trade. This contradicts the "in" versus "involving" distinction. We would expect on the Commission's reasoning that this provision would refer to "transactions *in* futures." The use of the term "involving" instead, within the very amendment that the CFTC claims embraces

this distinction, weighs heavily against the view that any such distinction was intended by Congress.[12]

The CFTC argues further that the proviso properly understood aids its cause. The proviso sweeps back into the CFTC's jurisdiction otherwise exempt "transactions in foreign currency" that "involve the sale thereof for future delivery" and are "conducted on a board of trade." Since the proviso refers to futures without mentioning options, the Commission submits that the exemption itself should be read only to cover futures because Congress cannot reasonably have intended to regulate exchange trading in foreign currency futures without also regulating exchange trading in

---

[12] Similarly, the statute refers at one point to "[t]ransactions *in* commodities *involving* the sale thereof for future delivery . . . and known as 'futures.'" 7 U. S. C. § 5 (emphasis added). Had Congress meant to maintain the Commission's distinction, we would not have expected the Legislature to use the words "in" and "involving" loosely in the same sentence to refer to futures, which the CFTC informs us are transactions "in" (but not "involving") foreign currency. Similarly, the statute refers elsewhere to "transaction[s] *in an option* on foreign currency." § 6c(f) (emphasis added). If Congress had spoken in the manner the CFTC suggests, that provision would instead use the phrase "transactions *involving* an option."

The statute's general jurisdictional provision also fails to maintain the distinction the Commission presses. The CEA provides that the CFTC "shall have exclusive jurisdiction . . . with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . .), and transactions *involving* contracts of sale of a commodity for future delivery." § 2(i) (emphasis added). The Commission submits that this language gives the CFTC regulatory authority over options on futures contracts, see Snider § 10.11, and argues that the use of the word "involving" is therefore in keeping with its interpretation of the statutory scheme. See Brief for CFTC 32. But § 2(i) provides the CFTC with exclusive jurisdiction over far more. Among other things, it explicitly grants jurisdiction over any "transactio[n] *involving* contracts of sale of a commodity for future delivery," plainly meaning at a minimum ordinary futures contracts, which the Commission otherwise insists are transactions "in" commodities.

such options. We agree that Congress intended no such anomaly. But we are satisfied that the anomaly is best avoided by reading the proviso broadly rather than reading the exemption narrowly.

The proviso's language fairly accommodates inclusion of both options and futures. To fall within the proviso, a transaction must *"involve* the sale [of foreign currency] for future delivery." § 2(ii) (emphasis added). Because options convey the right to buy or sell foreign currency at some future time prior to their expiration, they are transactions "involv-[ing]" or related to the sale of foreign currency for future delivery. Thus, both futures and options are covered by both the exemption and the proviso. While that may not be the only possible reading of the literal text, and we do not intend to suggest that a similar construction would be required with respect to other provisions of the CEA, our interpretation is faithful to the "contemporary legal context" in which the Treasury Amendment was drafted. *Cannon* v. *University of Chicago,* 441 U. S. 677, 699 (1979); see also *Massachusetts* v. *Morash,* 490 U. S. 107, 115 (1989) (noting that "'in expounding a statute, we [are] not . . . guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy'") (quoting *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 51 (1987)).

Finally, the CFTC calls our attention to statements in the legislative history of a 1982 amendment to the CEA,[13] indicating that the drafters of that amendment believed that the CFTC had the authority to regulate foreign currency options "when they are traded other than on a national securities exchange." See S. Rep. No. 97–384, p. 22 (1982). Those statements, at best, might be described as "legislative dicta" because the 1982 amendment itself merely resolved a conflict between the Securities Exchange Commission and the CFTC

---

[13] Futures Trading Act of 1982, Tit. I, § 102, 96 Stat. 2296, 7 U. S. C. § 6c(f).

concerning their respective authority to regulate transactions on an exchange.   See Snider § 10.24.   The amendment made no change in the law applicable to off-exchange trading. Although these "dicta" are consistent with the position that the CFTC advocates, they shed no light on the intent of the authors of the Treasury Amendment that had been adopted eight years earlier.   See, *e. g., Mackey* v. *Lanier Collection Agency & Service, Inc.,* 486 U. S. 825, 839–840 (1988).[14]

## V

Underlying the statutory construction question before us, we recognize that there is an important public policy dispute—with substantial arguments favoring each side.   Pe-

[14] Though the CFTC's brief disclaims any need for it, Brief for CFTC 48, at oral argument the Commission requested for the first time that we give deference to its interpretation of the Treasury Amendment as the agency "charged with administering" it.   *Smiley* v. *Citibank (South Dakota), N. A.,* 517 U. S. 735, 739 (1996); Tr. of Oral Arg. 54; see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984).   If *Chevron* principles were applicable, we are unsure that the CFTC's position would be the one owed deference.   As the Commission concedes, Brief for CFTC 25, the Treasury Department has taken a quite different view of the statute—one consonant with the interpretation set forth here—to which petitioners argue deference is owed if *Chevron* is invoked.   A reasonable argument could be made that Congress intended to charge Treasury, rather than the Commission, with administering the dimensions of the aptly named Treasury Amendment, which was specifically enacted at the behest of Treasury to confine the CFTC's activities. Cf. *Smiley,* 517 U. S., at 740–741 (explaining that *Chevron* deference arises out of background presumptions of congressional intent); *Martin* v. *Occupational Safety and Health Review Comm'n,* 499 U. S. 144, 157–158 (1991) (allocating power "authoritatively to interpret . . . regulations" after assessing "available indicia of legislative intent").   We need not "resolve the difficult issues regarding deference which would be lurking in other circumstances."   *Estate of Cowart* v. *Nicklos Drilling Co.,* 505 U. S. 469, 477 (1992).   Because "the statute, as a whole, clearly expresses Congress' intention" to include foreign currency options within the Treasury Amendment's exemption, administrative deference is improper.   *Dole* v. *Steelworkers,* 494 U. S. 26, 42 (1990).

titioners, their *amici,* and the Treasury Department argue that if off-exchange foreign currency options are not treated as exempt from CEA regulation, the increased costs associated with unnecessary regulation of the highly sophisticated OTC foreign currency markets might well drive this business out of the United States.[15]  The Commission responds that to the extent limited exemptions from regulation are necessary, it will provide them, but argues that options are particularly susceptible to fraud and abuse if not carefully policed. Brief for CFTC 26, 49.  As the Commission properly acknowledges, however, these are arguments best addressed to the Congress, not the courts.  See *United States* v. *Rutherford,* 442 U. S. 544, 555 (1979).  Lacking the expertise or authority to assess these important competing claims, we note only that "a literal construction of a statute" does not "yiel[d] results so manifestly unreasonable that they could not fairly be attributed to congressional design."  *Ibid.*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I agree with the Court that "the purposes underlying the Treasury Amendment are most properly fulfilled by giving effect to the plain meaning of the language as Congress enacted it," *ante,* at 474, which includes options to buy or sell foreign currency.  This principle is contradicted, however, by the Court's extensive discussion of legislative history, see *ante,* at 471, n. 8, 473–474, 478–479, as though that were necessary to confirm the "plain meaning of the lan-

---

[15] Brief for Petitioners 23–25; Brief for Crédit Lyonnais et al. as *Amici Curiae* 3; Brief for Foreign Exchange Committee et al. as *Amici Curiae* 6; Brief for CFTC 25.

guage," or (worse) might have power to overcome it.   I join all except those portions of the opinion, which achieve nothing useful and sow confusion in the law.