**NEW YORK CURRENCY RESEARCH CORPORATION, Petitioner,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

**Docket No. 98–4159.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1998.

Decided June 15, 1999.

Jacob Ginsburg, New York, New York (Jacob Laufer, Laufer, Halberstam & Karish, New York, New York, of counsel), for Petitioner.

Beth G. Pacella, Washington, D.C. (Daniel R. Waldman, General Counsel, J. Douglas Richards, Deputy General Counsel, Commodity Futures Trading Commission, Washington, D.C., of counsel), for Respondent.

Before: VAN GRAAFEILAND, CARDAMONE, and CABRANES, Circuit Judges.

CARDAMONE, Circuit Judge:

We deal on this appeal with the interpretation of a statute and rules used by the Commodity Futures Trading Commission (Commission or CFTC) to compel the production of records. The Commission requested, via a letter, voluminous records from petitioner New York Currency Research Corporation (New York Currency, or petitioner), a corporation once registered as a commodity trading advisor and a commodity pool operator. In response to the letter, petitioner said it had never acted as either a trading advisor or a pool operator and believed therefore that absent a subpoena it was not obliged under the statute and rules to produce the documents for the Commission.

In a subsequent enforcement action by the CFTC's Division of Enforcement (Division) pursuant to expedited procedures, the Division was unable to convince an Administrative Law Judge (ALJ) that the Commission was entitled to compel the production of records from petitioner. Hence, in his initial decision the ALJ dismissed the case against petitioner. The Division took an administrative appeal before the Commission, which found four violations and labeled New York Currency's actions a "naked attempt to circumvent the regulatory obligations imposed under the [Commodity Exchange] Act." The seriousness of the violations, in the Commission's opinion, warranted a cease and desist order and a civil monetary penalty amounting to $110,000. Upon reconsidering the case, the Commission reduced the number of violations from four to two, but left the monetary assessment undisturbed and lifted a stay of enforcement it had earlier granted.

Certain aspects of this case have an Alice in Wonderland quality about them. The CFTC's rules promulgated in 17 C.F.R. state that they are to be construed to secure a just and speedy determination "with full protection for the rights of all parties." 17 C.F.R. § 10.1. For purposes of a quick decision, the Commission may adopt expedited procedures and waive the quoted protections provided respondents, so long as no party is prejudiced. *See id.* § 10.3(b). For example, after a complaint is served respondent normally has 20 days to respond, *see id.* § 10.23(c), but under the expedited procedures the Commission may shorten the time limit prescribed by the rules for filing any document, *see id.* § 10.6. We assume that in the usual case the employment of expedited procedures and waiver of such protections is prompted by the Commission's belief that quick decision best serves the public interest.

In the present case, when the Commission's request to New York Currency did not result in the production of the material sought, the Commission could have made use of a prehearing conference under § 10.41—as suggested by petitioner—for the purpose of clarifying the issues or promoting a fair hearing. If that did not succeed, the CFTC, as always, had resort to its subpoena powers under § 10.68. Yet, it appears from this record that rather than following these rules, which the CFTC itself had promulgated, the Commission, in a fit of pique from what it viewed as petitioner's intransigent refusal to do its bidding and unwilling to consider any other reason than its own will, moved immediately to an expedited procedure. In so doing it stripped the ALJ—so he believed—of his discretion to reinstitute the standard procedures, and at the same time fulfilled no public interest that we can see. Instead, the Commission appears to have acted the role of the Queen who declared in a similar fit of pique during the hurried trial of the Knave of Hearts, "Sentence first—verdict afterwards." Lewis Carroll, *Alice's Adventures in Wonderland* 156 (Justin Todd illus., Crown Publishers 1984).

## BACKGROUND

### A. *Events Leading to Proceedings*

We turn to the facts. New York Currency was registered as a commodity trading advisor (CTA) and a commodity pool operator (CPO) for 15 months, from January 16, 1996 to April 3, 1997. It is an off-exchange foreign currency trader. Thus, in light of the Supreme Court's decision in *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), clarifying that off-exchange trading in foreign currency options is exempt from CFTC regulation, New York Currency permitted its registrations to lapse. Prior to the decision in *Dunn*, New York Currency had mistakenly believed it was required to be registered. In the summer of 1997 it ceased doing business.

On July 25, 1997, three months after petitioner's registrations had expired, the Division mailed petitioner a letter directing it to produce—without specifying for what period of time—the following information: (1) the name, address, and telephone number of each client, subscriber, or participant; (2) samples or copies of all reports, letters, circulars, memoranda, publications, writings, or other literature or advice distributed to clients, subscribers, or participants, or prospective clients, subscribers, or participants; (3) any and all opening account documents, powers of attorney, financial and credit records, commission or fee agreements, and any other documents accompanying or related thereto for each client, subscriber, or participant; (4) any and all trading records, confirmations, and daily and monthly account statements for each client, subscriber, or participant; and (5) any and all records, notes, correspondence, and taped conversations relating to New York Currency, including but not limited to customer complaints and communications between New York Currency, Michael Matejka (the President of New York Currency), their agents, employees, or representatives and any third parties or any governmental agencies, bodies, or entities. This letter request was returned to the Division by the U.S. Postal Service, stamped "Moved, unable to forward."

On August 5, 1997 the Division sent another letter to petitioner's new address containing a nearly identical request, but this letter, unlike the first one, specified that the requested documents cover the period from "September 1995 to the present." The requested information therefore included material outside petitioner's registration period that began in January 1996 and ended April 3, 1997. Through counsel, New York Currency declined to produce the requested documents, asserting that the Commission lacked jurisdiction over New York Currency's activities. On September 5, 1997 the Division explained in a letter to petitioner's counsel that it had a statutory right to inspect books and records New York Currency was required to keep while registered, and implied that failure to comply with its request could result in an enforcement action. Ten days later the Division made another production request, and included the Commission's *Statement to Registered Persons Directed to Provide Information or Access to Books and Records Other Than Pursuant to Commission Subpoena.* Petitioner again declined on the grounds that its activities were outside the ambit of CFTC authority, but repeated its invitation to meet with the Division to confer on the matter.

### B. *Hearing and ALJ Initial Decision*

Nearly three months later, on December 17, 1997, the Division filed a single count complaint alleging that the failure to produce the documents violated § 4n(3)(A) of the Commodity Exchange Act (Act), codified at 7 U.S.C. § 6n(3)(A), and CFTC Rules 1.31(a)(2), 4.23, and 4.33, promulgated under the Act and codified at 17 C.F.R. §§ 1.31(a)(2), 4.23, and 4.33. Pursuant to § 10.3 of its rules of practice, 17 C.F.R. § 10.3(b), the Commission exercised its authority to waive subparts A through H of

those practice rules, *id.* §§ 10.1–10.108— normally applicable to Commission adjudicatory proceedings, *id.* § 10.1—and instead commenced expedited proceedings against New York Currency.

Service by registered mail occurred at the height of the holiday season on December 18, 1997 with an extremely tight litigation schedule that required pleadings to be filed, discovery completed, and an oral hearing convened all within 11 calendar days. The Division's complaint requested relief in the form of a cease and desist order and a civil monetary penalty of not more than the higher of $110,000 or triple the monetary gain to petitioner arising from each violation.

On December 24, 1997 petitioner informally requested additional time to prepare for the hearing. The Division objected to an adjournment, and the request was denied by the ALJ because of his view that, due to the expedited schedule, he had no discretion regarding the hearing date. Petitioner then filed a timely answer on December 29, 1997, and moved to dismiss the complaint, for summary judgment, and for additional time to prepare for the hearing. The ALJ denied the motion, stating that the expedited complaint stripped him of authority to grant the requested relief.

A one-day oral hearing was held December 29, 1997. At the hearing, the Division characterized the case as involving only three issues, that is, whether New York Currency: (1) was registered as a CTA and a CPO; (2) was subject to recordkeeping requirements as a result of registration; and (3) had failed to maintain and produce these records despite being required to do so. The Division's proof consisted primarily of records showing New York Currency's registration as a CTA and a CPO and copies of the correspondence between the Division and petitioner. The defense came principally from the testimony of New York Currency's president, Michael Matejka. Although conceding that his company had been registered with the Commission as a CTA and a CPO for a little over one year in 1996, Matejka went on to testify that even during that time the company did not function as a CPO or a CTA in any capacity other than with respect to off-exchange foreign currency transactions in the spot market, an area exempt from CFTC regulation under the *Dunn* decision. He explained that he had registered New York Currency based on the mistaken assumption that the company was required to be registered to trade foreign currency.

Following the Commission's expedited procedure, both parties filed their initial post-hearing submissions on January 5 and reply briefs on January 8. The ALJ was directed by the complaint to issue his initial decision no later than January 15, 1998. On January 12 the ALJ issued his initial decision dismissing the complaint, stating that the Commission had the right to issue an investigative or trial subpoena for petitioner's records, and that such approach was still available to the Commission. Rejecting the Division's argument that mere registration brings one under § 4n(3)(A) of the Act, the ALJ further ruled that § 4n(3)(A) and Rules 4.23 and 4.33 apply only to an entity actually operating as a CTA or a CPO, and that the Division had the burden of proving that petitioner was operating in one or both of these capacities. Because the Division failed to show the nature of petitioner's operations, the ALJ concluded petitioner had no duty to maintain books and records, and could not be said therefore to have violated the production requirement under Rule 1.31. The ALJ then dismissed the Division's complaint in its entirety.

## C. *Commission's Original and Amended Orders*

The Division filed exceptions to the ALJ's initial decision on January 15, 1998, contending that New York Currency's registration as a CTA and a CPO triggered its recordkeeping and production obligations. It further asserted that the ALJ's interpretation of § 4n(3)(A) and Rules 4.23 and

4.33 would frustrate the purpose of the Act by requiring the Commission to prove that persons registered as CTAs and CPOs were actually engaging in those activities before it could obtain records relating to their activities that would contain proof of that fact.

On February 6, 1998 the Commission issued an order (original order) in which it reversed the initial decision of the ALJ and found New York Currency liable for violations of § 4n(3)(A) of the Act and Rules 1.31, 4.23, and 4.33. Based on these findings, the Commission imposed a cease and desist order and the $110,000 civil monetary penalty.

Petitioner moved for reconsideration and a stay of the original order pending reconsideration by the Commission and pending its petition for review by this Court. In an order dated March 31, 1998, the Commission granted petitioner's motion for reconsideration, vacated its finding that petitioner violated Rules 4.23 and 4.33 and reaffirmed the remaining findings and sanctions contained in the original order. In addition, the Commission lifted the stay of sanctions and denied petitioner's request for a further stay pending review by this Court. Petitioner's timely request for review of the amended order followed.

## DISCUSSION

The Commission asserts that New York Currency's failure to comply with its production requests constitutes a violation of § 4n(3)(A) of the Act and Commission Rule 1.31(a)(2). In the proceedings below, the Division proved only that New York Currency was registered as a CPO and a CTA for a little over one year. Petitioner does not dispute that the CFTC requested production of documents and that it refused to produce them. Rather, it contends that, although registered for a limited period of time, it nonetheless had no obligation to keep and produce records. Because this case involves no disputed issues of fact, the conflict is resolved as a matter of law by construing the statute

and regulations involved and applying them to the present facts.

## I Standard of Review

We review the CFTC's interpretation and application of the Commodity Exchange Act under the methodology announced by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* when Congress has "'directly spoken to the precise question at issue,'" we are obliged to give effect to its "'unambiguously expressed intent.'" *WLNY–TV, Inc. v. FCC,* 163 F.3d 137, 142 (2d Cir. 1998) (quoting *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778). This so-called "first step" of *Chevron* may, in some cases, resolve the statutory dispute, in which event the first step is the only step needed for analysis. But if a "'statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron,* 467 U.S. at 843). This is the so-called "second step" of *Chevron.*

Although *Chevron* dealt only with an agency's interpretation of relevant federal statutes, similar principles apply to judicial review of an agency's interpretation of its own regulations. *See Reno v. National Transp. Safety Bd.,* 45 F.3d 1375, 1379 (9th Cir.1995); *see also T.S. v. Board of Educ.,* 10 F.3d 87, 89 (2d Cir. 1993). Accordingly, the Commission's interpretation of its regulations would be entitled to "'controlling weight unless it [was] plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (quoting *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)); *accord Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

The Commission would have us proceed directly to the second step of *Chevron,* where its interpretations would be given controlling weight, and would have us affirm on this basis. But we decline to do so because here, under the first step, the Commission's interpretation contradicts the plain language of the statute and regulations; where such is the case the "plain language of course controls," *United States v. Lewis,* 93 F.3d 1075, 1080 (2d Cir.1996).

## II Statutory and Regulatory Framework

### A. *Section 4n(3)(A) of the Act*

■ When called upon to construe a statute, we begin analysis by examining the statutory language. *See International Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 558, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). The plain meaning of that language ordinarily informs our understanding of a statutory or regulatory term. *See T.S. v. Board of Educ.,* 10 F.3d at 89; *Westnau Land Corp. v. U.S. Small Bus. Admin.,* 1 F.3d 112, 115 (2d Cir.1993). It appears that the Commission—based on a reading of its prior decisions—acknowledges this basic principle of statutory construction. *See, e.g., Grandview Holding Corp. v. National Futures Assoc.,* [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,-996, at 44,809 (C.F.T.C. Mar. 18, 1997) (citing *Reno v. National Transp. Safety Bd.,* 45 F.3d at 1379).

### 1. *Plain Meaning of § 4n(3)(A)*

■ We turn then to the statute underlying this litigation. Section 4n(3)(A) of the Commodity Exchange Act, 7 U.S.C. § 6n(3)(A), states

Every commodity trading advisor and commodity pool operator registered under this chapter shall maintain books and records and file such reports in such form and manner as may be prescribed by the Commission. All such books and records shall be kept for a period of at least three years, or longer if the Commission so directs, and shall be open to

inspection by any representative of the Commission or the Department of Justice. Upon the request of the Commission, a registered commodity trading advisor or commodity pool operator shall furnish the name and address of each client, subscriber, or participant, and submit samples or copies of all reports, letters, circulars, memorandums, publications, writings, or other literature or advice distributed to clients, subscribers, or participants, or prospective clients, subscribers, or participants.

This statutory provision is clear. It applies to all CTAs and CPOs "registered under this chapter" and directs them to maintain records and to file reports as prescribed by the Commission. Since this duty is only imposed on CTAs and CPOs who are registered, to support a finding of liability requires the Commission to show that petitioner (a) was either a CPO or a CTA and (b) was registered under the applicable chapter.

Other provisions of the Act support this interpretation of § 4n(3)(A). For example, 7 U.S.C. § 6f(b) (formerly 7 U.S.C. § 6f(2)), provides that *"each person* so registered [as a futures commission merchant] shall at all times" meet prescribed minimum financial requirements. And a related provision, § 6g(a), explains that *"[e]very person* registered hereunder as [a] futures commission merchant, introducing broker, floor broker, or floor trader shall make such reports as required." These examples, taken from other provisions of the same statute, show that Congress imposed certain obligations on *persons* that arise simply from the act of registration itself, independent of whether those persons *also function* as merchants, brokers, or traders.

■ In § 4n(3)(A), by contrast, Congress chose to impose obligations not upon "each *person* " or "every *person* " registered under the Act, but only upon "[e]very *commodity trading advisor* and *commodity pool operator* registered under this

chapter." Where particular language is found in one section of a statute, but Congress has omitted it from another section of the same statute, courts generally presume that Congress acted purposefully in what it included and what it excluded. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *United States v. Piervinanzi,* 23 F.3d 670, 680 (2d Cir.1994) ("The fact that Congress uses different language in defining violations in a statute indicates that Congress intentionally sought to create distinct offenses."). We see nothing to rebut that presumption in this case, and we accordingly hold that a finding of liability under § 4n(3)(A) requires a showing not only of registration under the Act, but also proof of the nature of the entity's functions as a CTA or a CPO.

### 2. *Consistency With Other Opinions*

The Commission contends that its own decision in *In re Premex, Inc.,* [1982–1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,992, at 28,354 (C.F.T.C. Feb. 1, 1984), *aff'd in relevant part, rev'd in part,* 785 F.2d 1403 (9th Cir.1986) (*Premex*), supports its proffered interpretation that registration alone triggers recordkeeping and production requirements. But *Premex* actually suggests a contrary reading of § 4n(3)(A).

In *Premex,* a corporation registered as a futures commission merchant under the above mentioned statutes argued that until it engaged in transactions that fell under the coverage of the statutory provision, it had no obligation to maintain the relevant minimum capital requirements. *Id.* at 28,-354–55. The Commission disagreed, holding that the minimum capital requirement for futures commission merchants "necessarily flowed from the registration status that the company itself had chosen." *Id.* at 28,357. While in so concluding the CFTC's opinion focused on the legislative history of the Act, it need not have resorted to the Act's history, for the terms of the futures commission merchant statute at issue clearly prescribed that "*each person so registered[, as a futures commission merchant,]* shall at all times continue to meet such prescribed minimum financial requirements." 7 U.S.C. § 6f(2) (1982) (now § 6f(b)). Thus, under § 6f(b) it was Premex's status as a registrant—"each person so registered"—rather than its activities as a futures commission merchant, that led inevitably to a finding of liability against it.

Further, the Commission cites its decision in *Wichman v. Hewitt,* [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,613, at 36,630 (C.F.T.C. Mar. 7, 1990), as confirming its readings of both § 4n(3)(A) and Rule 1.31. In *Wichman,* the Commission affirmed the ALJ's finding that the respondent subjected himself to the regulatory obligations of registrants when he registered as a CTA, regardless of whether he was required to register. *Id.* at 36,627, 36,630. The provision at issue in *Wichman,* 17 C.F.R. § 4.31(a), read: "No commodity trading advisor registered or required to be registered ... may solicit a prospective client, or [take certain other steps] unless the commodity trading advisor ... delivers ... to the prospective client a Disclosure Document...."

There is a clear distinction between the case at hand and *Wichman.* Importantly, as the ALJ noted, in *Wichman* respondent's status as a CTA was not in question. Instead, complainant Wichman asserted that although he was a CTA, he was exempt from registration under § 4m(1) of the Act. He declared that even though he was registered, he was not obligated to provide disclosure statements because his registration was voluntary and therefore distinct from requirements imposed on CTAs for whom registration was mandatory. *See Wichman,* [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 36,630. In holding that the voluntary nature of respondent's registration did not relieve him of his duties as a registered CTA, the Commission applied the same

two criteria we apply here. Once it found respondent to be both registered and acting as a CTA, it required the complainant to comply with the commodity trading advisor disclosure provision. *See id.*

Accordingly, because § 4n(3)(A) applies not to every "person registered" as a CPO or a CTA, but rather only to "[e]very commodity trading advisor and commodity pool operator registered," the Commission must show that New York Currency actually acted as either a CPO or a CTA.

### 3. *Definitions of CTA and CPO*

■ Having resolved that the plain meaning of § 4n(3)(A) requires, consistent with the opinions discussed, being both registered and acting either as a commodity trading advisor or a commodity pool operator, we pass next to the statutory definitions of these terms. A commodity trading advisor is "any person who"

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in—

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market;

(II) any commodity option authorized under section 6c of this title; or

(III) any leverage transaction authorized under section 23 of this title; or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

7 U.S.C. § 1a(5). No evidence in the record indicates that petitioner engaged in activity relating to either: (1) a contract for future delivery on or subject to the rules of a contract market, (2) a commodity option authorized under § 6c, or (3) any leverage transaction authorized under § 23. Hence, the Commission failed to show that New York Currency is a com-

modity trading advisor as that term is defined in the Act.

■ A commodity pool operator is

any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market, except that the term does not include such persons not within the intent of the definition of the term as the Commission may specify by rule, regulation, or order.

7 U.S.C. § 1a(4). Again, the Commission produced no evidence that petitioner ever operated a investment trust or similar pool in order to trade in contracts for future delivery, or engaged in such activities for the purpose of trading on or subject to the rules of a Commission-designated contract market. The proof presented by New York Currency—uncontroverted by the Commission—shows that petitioner introduced customers to banks for purposes of trading in foreign currency in the over-the-counter market, and traded itself in the over-the-counter market through banks. As a consequence, New York Currency was not shown to have acted as a commodity pool operator either.

Beyond whether the proof showed that New York Currency acted either in the capacity of a CTA or a CPO, the Commission conceded that, in its view, the nature of petitioner's activities was irrelevant to the offenses charged against it, and that the Commission had no interest in attempting to establish that petitioner acted in either capacity. Hence, a finding of liability against New York Currency cannot rest on a violation of § 4n(3)(A).

### B. *CFTC Rule 1.31*

Construing a regulation is similar to interpreting a statute; that is, we begin by examining its language. *See Reno v. National Transp. Safety Bd.*, 45 F.3d at 1379; *see also T.S. v. Board of Educ.*, 10 F.3d at 89. Our first task is to ascertain the plain meaning of CFTC Rule 1.31.

The Commission found New York Currency violated Rule 1.31(a)(2), 17 C.F.R. § 1.31(a)(2), which states, in pertinent part

A copy of any book or record required to be kept by the Act or by these regulations shall be provided, at the expense of the person required to keep the book or record, to a Commission representative upon the representative's request.... All copies or originals shall be provided promptly.

This rule does not specify who must keep books or records, what material must be kept or who is required to produce them upon the Commission's request. Rather, it sets out the production duty imposed upon those persons already required either by the Act or by Commission regulations to keep records. We ruled earlier that the Act did not impose upon petitioner any obligation to maintain records simply by virtue of its registration as a CTA and a CPO. Therefore, we turn to the Commission's regulations to determine whether they impose upon petitioner an independent obligation to keep records.

The CFTC asserts that its Rules 4.23 and 4.33 obligate New York Currency to keep records. Rules 4.23 and 4.33 define the type of records to be kept by CTAs and CPOs. Rule 4.23 states that "[e]ach commodity pool operator registered or required to be registered under the Act must make and keep [specified] books and records in an accurate, current and orderly manner at its main business office and in accordance with § 1.31." Likewise, Rule 4.33 requires that "[e]ach commodity trading advisor registered or required to be registered under the Act must make and keep [specified] books and records in an accurate, current and orderly manner at

its main business office and in accordance with § 1.31." The regulatory requirements for both CTAs and CPOs are identical to those found in the Act. *See* 17 C.F.R. § 1.3(bb)(1), (cc) (defining a CPO using the same language as that found in 7 U.S.C. § 1a(4) and a CTA using the same language as found in § 1a(5)).

Following the same reasoning used in interpreting the statute, we reach the same conclusions. The Commission must establish that petitioner was a CPO in order to prove that it had a recordkeeping obligation under Rule 4.23. Maintaining the position that petitioner's activities were of no legal consequence, the Commission presented no evidence that New York Currency traded in contracts for future delivery, accepted and pooled funds, or traded on or subject to the rules of a Commission-designated contract market. Failing to show that petitioner was a CPO, the Commission cannot therefore subject it to Rule 4.23.

The Commission fares no better under the corresponding rule addressing CTAs. The plain language of Rule 4.33 imposes recordkeeping duties only upon entities that act as CTAs. The Commission definition mirroring the Act's definition requires that the CFTC show that New York Currency engaged in activities listed in 7 U.S.C. § 1a(5) or Rule 1.3(bb). Because the Commission presented no evidence of these activities, it failed to show that petitioner was subject to Rule 4.33. Absent a recordkeeping obligation under either Rule 4.23 or 4.33 petitioner cannot be liable for a violation of the production requirements under Rule 1.31(a)(2).

Based on the evidence presented by the Commission, New York Currency has not violated either § 4n(3)(A) of the Act or Rule 1.31 of the Commission Rules. Since we have ruled that petitioner is not liable for violating the Act, it is unnecessary for us to address petitioner's additional concerns regarding the Commission's waiver of its rules of practice and the sanctions it

imposed. Further, the Commission's argument that this holding would frustrate the Act's purposes is readily resolved by the Commission's ability to use its subpoena power, 17 C.F.R. §§ 10.68 and 11.4, to obtain the records in question.

### CONCLUSION

For the reasons stated, the petition for review is granted and the matter is remanded with instructions to dismiss the complaint in its entirety.