### In re Barbara Jean HOSKINS, Debtor.

### No. 00–20101.

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

April 20, 2001.

---

Michael C. Reinert, Attorney at Law, Saginaw, MI, for debtor.

Lori A. Jenneman, Attorney at Law, Bingham Farms, MI, for Providian National Bank.

Thomas W. McDonald, Saginaw, MI, Chapter 13 Trustee.

## OPINION ON STRIP OFF OF TOTALLY UNSECURED JUNIOR MORTGAGE

ARTHUR J. SPECTOR, Bankruptcy Judge.

### Introduction

Barbara J. Hoskins filed for chapter 13 bankruptcy relief on January 18, 2000. The Debtor's home is subject to claims secured by "First" and "Second" mortgages. Debtor's Schedule D. ContiMortage, the first mortgagee, is said to hold a claim of $30,594.74, while the second mortgagee, Providian National Bank, is owed $21,447.31. *Id.* The Debtor asserts that the entire amount of Providian's claim is unsecured, *see id.* Her plan treats Provi-

dian's claim the same as all other nonpriority unsecured claims, that is, to share pro rata in dividends to be disbursed by the chapter 13 trustee over the course of the five-year plan. Dividends are projected at 29%. The plan also provided for the termination of Providian's security interest when the Debtor successfully completes the plan. *See* Debtor's Plan at pp. 2–4, 6 & 8.

Not surprisingly, Providian opposed confirmation of the Debtor's plan. At the confirmation hearing, on September 28, 2000, the Court found that the home had a market value of only $25,000, based on an appraisal submitted as Debtor's Exhibit 1 and the appraiser's testimony. Providian does not necessarily contest this valuation. It offered no rebuttal testimony. Providian raises certain procedural objections. Those will be dealt with in Part 1 of this opinion. Part 2 will address Providian's contention that the Plan violates 11 U.S.C. § 1322(b)(2), and therefore ought not be confirmed.

### Part 1: Providian's Procedural Objections

Providian's first procedural objection was that it was not served in accordance with F.R.Bankr.P. 7004(h). That rule provides:

Unless otherwise provided by federal law, service upon a domestic or foreign corporation or upon a partnership or other unincorporated association that is subject to suit under a common name, and from which a waiver of service has not been obtained and filed, shall be effected:

(1) in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to

receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant, or

(2) in a place not within any judicial district of the United States in any manner prescribed for individuals by subdivision (f) except personal delivery as provided in paragraph (2)(C)(I) thereof.

This objection was mooted when the Debtor re-served the Plan and other documents upon Providian by certified mail in the manner required.

■ Providian's second procedural objection is that the relief requested cannot be provided by means of a contested matter (F.R.Bankr.P. 9014); but requires an adversary proceeding. While Providian complains (implicitly) about the non-applicability of certain procedural rules, it makes no attempt to identify those rules, much less explain how justice would be served by making those rules applicable. See F.R.Bankr.P. 9014 ("The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply."). Thus Providian's concern over "due process"—a dubious issue under any circumstances[1]—rings particularly hollow.

The more basic problem with the objection, however, is its premise. Rule 7001 identifies the types of disputes which are to be litigated as adversary proceedings. Providian presumably relies upon subparagraph (2), which refers to "a proceeding to determine the validity, priority, or extent of a lien." F.R.Bank.P. 7001(2).

The issue raised by the Debtor's plan/motion has nothing to do with the "validity" or "priority" of Providian's mortgage: Both of those issues are undisputed. In a sense, the motion could be said to question the "extent" of the mortgage, since the amount (or "extent") of Providian's secured claim will turn on the home's value.

Construing "extent" this broadly, however, creates a conflict with Rule 3012. This latter rule, as we have seen, states that "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest *on motion* of any party in interest." F.R.Bankr.P. 3012 (emphasis added). Since an adversary proceeding can only be initiated by a complaint, see F.R.Bankr.P. 7003, an expansive reading of Rule 7001(2) is incompatible with Rule 3012—a point made clear by the comment accompanying the latter rule:

The valuation of secured claims may become important in different contexts, e.g., to determine the issue of adequate protection under [section] . . . 361, impairment under [section] . . . 1124, or treatment of the claim in a plan pursuant to [section] . . . 1129(b) of the Code. . . . An adversary proceeding is commenced when the validity, priority, or extent of a lien is at issue as prescribed by Rule 7001. That proceeding is relevant to the basis of the lien[,] while valuation under Rule 3012 would be for the purposes indicated above.

---

1. The better view is that the contested-matter format does not necessarily compromise procedural due process. See *In re Zumbrun,* 88 B.R. 250, 252 (9th Cir. BAP 1988); *In re Timbs,* 178 B.R. 989, 995 (Bankr.E.D.Tenn. 1994); *In re Forty–Five Fifty–Five,* 111 B.R. 920, 922 (Bankr.D.Mont.1990); *In re Analytical Sys.,* 71 B.R. 408, 412 (Bankr.N.D.Ga. 1987). *But see In re Loloee,* 241 B.R. 655, 661 (9th Cir. BAP 1999) ("The procedural requirement in Rule 7001(2) that lien priorities be resolved by adversary proceeding has implications for due process that become important when a Rule 9014 contested matter is asked to do an adversary proceeding's job.").

Advisory Committee Note (1983) to F.R.Bankr.P. 3012.

■ We therefore agree with a leading bankruptcy treatise and with Judge Gregg of the Western District of Michigan that the term "extent," as used in Rule 7001(2), refers not to collateral valuation, but rather to identification of the property to which a lien is alleged to be subject. *See* 10 Collier on Bankruptcy, ¶ 7001.03[1] (15th ed. rev.2000); *In re Hudson,* 260 B.R. 421, 428–29 (Bankr.W.D.Mich.2001). On the very issue raised here by Providian, Judge Gregg recently explained:

> Is an adversary proceeding required to value a creditor's collateral and determine secured status under § 506(a)? The short answer is "no."

> An adversary proceeding includes "a proceeding to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding [related to a debtor's claimed exemptions]." Rule 7001(2). "Validity" is "having legal strength or force," Webster's Third New International Dictionary Of The English Language, Unabridged 2529 (1986), i.e. "enforceable." *Id.* at 751. "Priority" is "superiority in rank [or] position," as in "the priority in law of liens on a property." *Id.* at 1804. "Extent" is "the range (as of inclusiveness or application) over which something extends," i.e., the "scope" or "comprehensiveness." *Id.* at 805. The "extent" of a lien is not synonymous with the value of collateral; rather "extent" relates to the identification of the scope of specific property which is subject of the lien.

> Summarizing, "[a]n adversary proceeding is not required to modify a secured creditor's rights in chapter 13." *Lee Servicing Co. v. Wolf (In re Wolf),* 162 B.R. 98, 106 (Bankr.D.N.J.1993). An

adversary "proceeding is relevant to the basis of the lien itself. . . ." *Id.*

*Id.*

Since the Debtor's plan implicates none of the matters itemized in Rule 7001, we reject Providian's contention that an adversary proceeding is required. *See, e.g., In re Wolf,* 162 B.R. 98, 106 (Bankr.D.N.J. 1993).

■ Finally, Providian argues that the Debtor needed to file a motion for valuation of its claim pursuant to F.R.Bankr.P. 3012 rather than merely referencing the rule in the plan. It offers no rationale why a separate piece of paper is required if the plan itself contains sufficient information to alert Providian that its claim is in some jeopardy, and none comes to mind.

In compliance with 11 U.S.C. § 1321 and F.R.Bankr.P. 3015(b), the Debtor filed her plan. Her ultimate objective in doing so, of course, was to have the plan confirmed. *See* 11 U.S.C. §§ 1324 ("After notice, the court shall hold a hearing on confirmation of the plan. A party in interest may object to confirmation of the plan ."); 1325 (specifying that if certain conditions are satisfied, "the court shall confirm a plan"). The federal bankruptcy rules do not contemplate the filing by the debtor of a formal "motion" to confirm. To the contrary, F.R.Bankr.P. 3015(d) calls for parties in interest to be served with a copy of the plan, rather than a "motion," as such. *See* F.R.Bankr.P. 3015(d).

If only implicitly, then, it is fair to say that the very act of filing a plan constitutes a request that the Court enter an order confirming it, and so the chapter 13 plan itself *is* a motion. Black's Law Dictionary (7th ed.1999) (A "motion" . . . [is a] "written or oral application requesting a court to make a specified ruling or order.").

This conclusion is bolstered by Rule 9014, which states:

In a contested matter in a case not otherwise governed by these rules, <u>relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.</u> No response is required under this rule unless the court orders an answer to a motion. <u>The motion shall be served in the manner provided for service of a summons and complaint by Rule 7004,</u> and, unless the court otherwise directs, *the following rules shall apply: 7021, 7025, 7026, 7028–7037, 7041, 7042, 7052, 7054–7056, 7064, 7069, and 7071. The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply.*

F.R.Bankr.P. 9014 (emphasis added). The underlined portion of Rule 9014 describes how a "contested matter" is *initiated.* The italicized portion describes how it is to be *conducted*—i.e., the procedural rules to which a contested matter is subject once it has been initiated.

Now consider Rule 3015(f), which provides that "[a]n objection to confirmation is governed by Rule 9014." F.R.Bankr.P. 3015(f). It is fairly clear that this provision is *not* referring to that portion of Rule 9014 which deals with getting a contested matter started. After all, once an objection is filed, the "battle" has already been joined, and a hearing date has already been set. *See* F.R.Bankr.P. 2002 ("[T]he clerk ... shall give the debtor, the trustee, all creditors and indenture trustees not less than 25 days notice by mail of ... the time fixed for filing objections and the hearing to consider confirmation of a ... chapter 13 plan."); F.R.Bankr.P. 3015(d) ("The plan or a summary of the plan shall be included with each notice of the hearing on confirmation mailed pursuant to Rule 2002."). Thus it would be silly to infer from Rule 3015(f) that the plan proponent (or the objecting party) has to file a formal motion before the court can address the merits of the objection.

■ Properly construed, Rule 3015(f) refers only to that aspect of Rule 9014 describing how a contested matter is to be *conducted.* This means, in effect, that the plan serves the same role in the context of a disputed confirmation as does a "conventional" motion which initiates a contested matter. *See* F.R.Bankr.P. 9014 ("In a contested matter ..., relief shall be requested by motion....").

Of course, the Debtor's plan may not fully comply with the requirements of Rule 9013, which specifies that a "motion shall state with particularity the grounds [for the order requested] .... and shall set forth the relief or order sought." F.R.Bankr.P. 9013. That, however, goes to the question of whether the plan is a *defective* motion, not whether it is in fact a motion. And since Providian did not allege otherwise, the Court infers that any such defects were insignificant. *See generally* F .R.Civ.P. 61 (incorporated by F.R.Bankr.P. 9005) ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

Perhaps this objection is addressed to the quantum of notice provided by the plan. If so, that objection is also without merit. The plan gave ample warning that the Debtor was seeking to invalidate Providian's security interest because it had no economic value. In the portion of the Plan entitled "Secured Claims—Mortgage or Executory Land Contracts" the Debtor stated "SEE PAGE SIX (6) FOR TREATMENT OF PROVIDIAN SECOND MORTGAGE." That page stated the following (emphasis in original):

The Plan includes the following additional provision(s): *There isn't any equity*

*in the debtors [sic] home to which the Providian second mortgage could attach. It is therefore an entirely unsecured claim and shall be treated as such. Upon the debtor's successful completion of the plan, the Providian mortgage shall be entirely removed from the debtor's home and Providian National Bank shall immediately furnish the debtor with a mortgage discharge in recordable form. This plan strips the Providian National bank [sic] mortgage from the debtor's home.*

How much clearer can a notice get?

The plan also explained:

This is notice that the Confirmation Hearing shall include a hearing pursuant to F.R.BANKR.P. 3012 VALUING YOUR SECURED CLAIM.

Although in your opinion, your claim is a secured claim, it may nonetheless be classified as an unsecured claim, and be treated as such. **IT IS THE DEBTOR'S INTENT TO PROVIDE FOR EVERY CLAIM UNLESS SPECIFICALLY STATED OTHERWISE. UNLESS YOUR CLAIM IS SET FORTH SPECIFICALLY IN THIS PLAN AS A SECURED CLAIM, THE DEBTOR IS PURPOSELY CLASSIFYING YOUR CLAIM AS UNSECURED AND IT WILL BE TREATED AS AN UNSECURED CLAIM DESPITE YOUR BELIEF THAT IT IS A SECURED CLAIM. ACCORDINGLY, YOU MUST EITHER TIMELY OBJECT TO CONFIRMATION OF THIS PLAN, OR BE DEEMED TO HAVE ACCEPTED THIS PLAN'S TREATMENT OF YOUR CLAIM AS PROVIDED HEREIN[.]**

Such notice is sufficient as a matter of law. *See Hudson,* 260 B.R. 421, 430–33. Moreover, the notice was sufficient as a matter of fact. Providian timely filed its objection to plan confirmation and was well represented by counsel throughout.

The procedural objections are, therefore, overruled.

### Part 2. Is Providian's Claim Entitled to § 1322(b)(2) Protection?

Section 1322(b)(2) states that a "plan may ... modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims." 11 U.S.C. § 1322(b)(2) (emphasis added). Providian argues that it is entitled to the protection from modification afforded by the highlighted clause because its claim is secured by a mortgage on the Debtor's home. The Debtor counters with the argument that Providian's claim must be deemed unsecured by operation of 11 U.S.C. § 506(a), and that the claim is therefore subject to modification pursuant to § 1322(b)(2).

Section 506(a) provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." 11 U.S.C. § 506(a). Put simply, the effect of this statute is to render a secured claim unsecured to the extent that the claim exceeds the collateral's value. *See, e.g., United States v. Ron Pair Enters.,* 489 U.S. 235, 238–39, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("Section 506 ... governs the definition and treatment of secured claims.... Subsection (a) ... provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured." (footnote omitted)). Providian's claim is there-

fore entirely unsecured by virtue of § 506(a).

Providian, however, asserts that § 1322(b)(2)'s anti-modification protection applies without reference to § 506(a). The validity of that assertion turns on how one construes the Supreme Court's decision in *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). The Court's introductory summary of the issue presented and its disposition clearly helps Providian's cause: "The question is whether § 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence. We conclude that it does...." *Id.* at 325–26, 113 S.Ct. 2106. However, the Court's explanation for this holding is more ambiguous:

> [The debtors] ... argue that the protection of § 1322(b)(2) applies only to the extent the mortgagee holds a "secured claim" ... and that we must look first to § 506(a) to determine the value of the mortgagee's "secured claim." ... [The debtors] contend that the valuation provided for in § 506(a) operates automatically to adjust downward the amount of a lender's undersecured home mortgage before any disposition proposed in the ... Chapter 13 plan.... Section 1322(b)(2), they assert, allows unconditional modification of the ... leftover "unsecured claim" [held by the mortgagee, a bank].
>
> This interpretation fails to take adequate account of § 1322(b)(2)'s focus on "rights." That provision does not state that a plan may modify "claims" or that the plan may not modify "a claim secured only by" a home mortgage. Rather, it focuses on the modification of the "*rights of holders*" of such claims. [emphasis in original] By virtue of its mortgage contract with [the debtors] ..., the

> bank is indisputably the holder of a claim secured by a lien on [the debtors'] ... home. [The debtors] ... were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim. It was permissible for [the debtors] ... to seek a valuation in proposing their Chapter 13 plan, since § 506(a) states that "[s]uch value shall be determined ... in conjunction with any hearing ... on a plan affecting such creditor's interest." [ (quoting 11 U.S.C. § 506(a)).] But even if we accept [the debtors'] ... valuation, the bank is still the "holder" of a "secured claim," because [the debtors'] ... home retains $23,500 of value as collateral. The portion of the bank's [total] claim [of $71,335] that exceeds $23,500 is an "unsecured claim componen[t]" under § 506(a), ... *Ron Pair*, 489 U.S. [at] ... 239, n. 3, [109 S.Ct. 1026] ...; however, that determination does not necessarily mean that the "rights" the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim.
>
> ... [W]e generally assume that Congress has "left the determination of property rights in the assets of a bankrupt's estate to state law," since such "[p]roperty interests are created and defined by state law." ... Moreover, ... "[t]he justifications for application of state law are not limited to ownership interests," but "apply with equal force to security interests, including the interest of a mortgagee." ... The bank's "rights," therefore, are reflected in the relevant mortgage instruments, which are enforceable under Texas law. They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to

accelerate the loan upon default and to proceed against [the debtors'] . . . residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure. . . . These are the rights that were bargained for by the mortgagor and the mortgagee, *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 . . . (1992), and are rights protected from modification by § 1322(b)(2).

. . .

[The debtors] . . . urge us to apply the so-called "rule of the last antecedent" . . . to interpret § 1322(b)(2). . . . According to this argument, the operative clause "other than a claim secured only by a security interest in . . . the debtor's principal residence" must be read to refer to and modify its immediate antecedent, "secured claims." Thus, § 1322(b)(2)'s protection would then apply only to that subset of allowed "secured claims," determined by application of § 506(a), that are secured by a lien on the debtor's home—including, with respect to the mortgage involved here, the bank's secured claim for $23,500. We acknowledge that this reading of the clause is quite sensible as a matter of grammar. But it is not compelled. *Congress chose to use the phrase "claim secured . . . by" in § 1322(b)(2)'s exception, rather than repeating the term of art "secured claim." The unqualified word "claim" is broadly defined under the Code to encompass any "right to payment, whether . . . secure[d] or unsecured" or any "right to an equitable remedy for breach of performance if such breach gives rise to right to payment, whether . . . secure[d] or unsecured." 11 USC § 101(5). . . . It is also plausible, therefore, to read "a claim secured only by a [homestead lien]" as referring to the lienholder's entire claim, including both the secured and the unsecured components of the claim. Indeed, § 506(a) itself uses the phrase "claim . . . secured by a lien" to encompass both portions of an undersecured claim.*

*This latter interpretation is the more reasonable one,* since we cannot discern how § 1322(b)(2) could be administered under [the debtors'] . . . interpretation. [The debtors] . . . propose to reduce the outstanding mortgage principal to the fair market value of the collateral, and, at the same time, they insist that they can do so without modifying the bank's rights "as to interest rates, payments amounts, and [other] contract terms." Brief for Petitioners 7. That appears to be impossible. The bank's contractual rights are contained in a unitary note that applies at once to the bank's overall claim, including both the secured and unsecured components. [The debtors] . . . cannot modify the payment and interest terms for the unsecured component, as they propose to do, without also modifying the terms of the secured component. Thus, to preserve the interest rate and the amount of each monthly payment specified in the note after having reduced the principal to $23,500, the plan would also have to reduce the term of the note dramatically. That would be a significant modification of a contractual right. Furthermore, the bank holds an adjustable rate mortgage, and the principal and interest payments on the loan must be recalculated with each adjustment in the interest rate. There is nothing in the mortgage contract or the Code that suggests any basis for recalculating the amortization schedule—whether by reference to the face value of the remaining principal or by reference to the unamortized value of the collateral. This conundrum alone indi-

cates that § 1322(b)(2) cannot operate in combination with § 506(a) in the manner theorized by . . . [the debtors].

In other words, to give effect to § 506(a)'s valuation and bifurcation of secured claims through a Chapter 13 plan in the manner [the debtors] . . . propose would require a modification of the rights of the holder of the security interest. Section 1322(b)(2) prohibits such a modification where, as here, the lender's claim is secured only by a lien on the debtor's principal residence.

*Id.* at 328–32, 113 S.Ct. 2106 (emphasis added, except where otherwise noted).

A logical way to tackle *Nobelman* is to start with the Court's interpretation of § 1322(b)(2). *Cf. Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 120 S.Ct. 2180, 147 L.Ed.2d 187, 202 (2000) ("[I]n any case of statutory construction, our analysis begins with the language of the statute. . . . And where the statutory language provides a clear answer, it ends there as well." (citation omitted)). In the highlighted portion of the opinion, the Court makes clear that § 1322(b)(2)'s "other-than" clause refers *not* to "secured claims" (as determined by § 506(a)), but rather to a creditor's *entire* claim (determined without reference to § 506(a)). (Hereafter, this latter claim will be referred to as the "pre-valuation claim.") There are two possible inferences a lower court could draw from this interpretation.

One is that the clause operates totally independently of its "antecedent" phrase— i.e., "the rights of holders of secured claims." So construed, the statute could be restated to read: "The plan may modify the rights of holders of secured claims or unsecured claims. However, the rights of holders of pre-valuation claims secured only by a residential mortgage cannot be modified." With this construction, a mort-

gagee's claim would be immune from modification regardless of whether any portion of that claim would be deemed secured in accordance with § 506(a).

Under the alternative theory, predictably enough, the clause *would* be dependent on the antecedent phrase. Per this theory, the statute could be paraphrased: "The plan may modify the rights of holders of secured claims, but the rights of holders of pre-valuation claims secured only by a residential mortgage cannot be modified. The plan may also modify the rights of holders of unsecured claims." This interpretation would mean that a mortgagee is safe from modification only if at least a portion of its pre-valuation claim would be deemed secured under § 506(a).

The latter of these competing constructions, while more awkward than the former, is also more consistent with the actual wording of § 1322(b)(2). After all, that statute's other-than clause *is* tied to the "secured claim" portion which precedes it. Thus a judicial interpretation of that statute which transforms the clause into a "stand alone" provision is suspect.

In response, it could be argued that the Court's interpretation of the other-than clause negates any logical connection between that clause and the preceding phrase. Under this view, the very fact that (per *Nobelman*) the phrase contemplates application of § 506(a), whereas the clause does not, renders the grammatical linking superfluous: By its very nature, the other-than clause is a stand-alone provision.

In counter-response, one could stress that the Court's discussion of "the rule of the last antecedent," *Nobelman*, 508 U.S. at 330, 113 S.Ct. 2106, was limited to the question of whether the term "claim," as used in the other-than clause, was synonymous with the term "secured claim," as

used in the preceding phrase. So while the Court ruled that the terms carried different meanings, the argument goes, the decision leaves open the possibility that the clause is in other respects tethered to the phrase which precedes it.

■ If no other aspects of the *Nobelman* opinion are considered, a plausible case could be made for either of the foregoing interpretations. But, of course, the full opinion should be taken into account in attempting to ascertain the Court's intent. *Cf. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ("Statutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme...."). And when *Nobelman* is read "holistically," the balance tips in favor of the "dependent clause" theory.

As one might expect, the passage of critical importance concerns valuation under § 506(a). Again, the Court stated:

> [*The debtors*] ... *were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim.* It was permissible for [the debtors] ... to seek a valuation in proposing their Chapter 13 plan, since § 506(a) states that "[s]uch value shall be determined ... in conjunction with any hearing ... on a plan affecting such creditor's interest." *But even if we accept* [*the debtors'*] ... *valuation, the bank is still the "holder" of a "secured claim,"* because [the debtors'] ... home retains $23,500 of value as collateral. The portion of the bank's claim that exceeds $23,500 is an "unsecured claim componen[t]" under § 506(a) ...; however, that determination does not necessarily mean that the 'rights' the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are

limited by the valuation of its secured claim.

*Nobelman*, 508 U.S. at 328–29, 113 S.Ct. 2106 (emphasis added).

It is clear from the highlighted portion of this excerpt that the Court viewed the § 506(a) valuation as relevant: Were it not, then it would have been futile (rather than "correct"/"permissible") for the debtors to invoke that statute, and it would have made absolutely no difference whether the bank "still" held a secured claim under § 506(a). Rather than taking the position that § 1322(b)(2) "prevailed" over § 506(a), then, the Court purported to reconcile the two statutes. The Fifth Circuit, whose judgment *Nobelman* upheld, recognized this fact:

> Although the Justices affirmed the result we had reached in Nobleman [sic], they disagreed with our analysis. First, we concluded that § 506(a) and § 1322(b)(2) were in conflict.... Second, we concluded that § 1322(b)(2) trumped § 506(a).... The Supreme Court rejected our reasoning that § 506(a) was rendered a nullity by § 1322(b)(2)....

*In re Bartee*, 212 F.3d 277, 286 (5th Cir. 2000).

Given the Court's refusal to "nullify" § 506(a), it becomes fairly easy to choose between the competing interpretations of § 1322(b)(2) discussed earlier. As already noted, § 506(a) is relevant only if § 1322(b)(2)'s protection from modification is construed as a dependent clause, rather than as a freestanding provision. From a purely textual standpoint, then, the better view is that *Nobelman* construed § 1322(b)(2) in such a way as would permit modification of mortgage-secured claims that are deemed wholly unsecured by operation of § 506(a). *See, e.g., In re Tanner*, 217 F.3d 1357, 1360 (11th Cir.2000);

*Bartee,* 212 F.3d at 291; *In re McDonald,* 205 F.3d 606, 615 (3d Cir.), *cert. denied,* 531 U.S. 822, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000); *In re Mann,* 249 B.R. 831, 840 (1st Cir. BAP 2000); *In re Lam,* 211 B.R. 36, 41 (9th Cir. BAP 1997) (per curiam); *In re Phillips,* 224 B.R. 871, 872–73 (Bankr. W.D.Mich.1998); 8 Collier on Bankruptcy, § 1322.06[1][a][i] (15th ed. rev.2000) (noting *Nobelman's* "reli[ance] on the fact that, even after bifurcation, the creditor ... was 'still the 'holder' of a 'secured claim[,]' " and asserting that the "opinion strongly suggests ... that if a lien is completely undersecured, there would be a different result"); *see also In re German,* 258 B.R. 468, 469–70 (Bankr.E.D.Okla. 2001); 5 Norton Bankruptcy Law & Practice 2d § 121:5, p. 177 n. 57 (Supp. Feb. 2001) (collecting cases). *But see* K. Lundin, *Chapter 13 Bankruptcy,* § 4.46, at 4–56 (2d ed.1994) ("The clear implication of [the analysis in *Nobelman*] is that even a completely *unsecured* claim holder 'secured' only by a lien on real property that is the debtor's principal residence would be protected from modification by § 1322(b)(2) notwithstanding that such an 'unsecured' lienholder could not have an allowable secured claim under § 506(a)...." (*quoted in In re Perry,* 235 B.R. 603, 607 (S.D.Tex.1999), *overruled by Bartee,* 212 F.3d 277)).

For what it is worth, the foregoing assessment of *Nobelman* apparently represents the majority view. *See, e.g.* 5 Norton Bankruptcy Law & Practice 2d § 121:5, p. 176 (Supp.Feb.2001); *German,* 258 B.R. at 469. This "pro-modification" camp also enjoys the distinction of having won over all three circuit courts and both Bankruptcy Appellate Panels that have addressed the issue. *See Tanner,* 217 F.3d at 1360; *Bartee,* 212 F.3d at 291; *McDonald,* 205 F.3d at 615; *Mann,* 249 B.R. at 840; *Lam,* 211 B.R. at 41. *But see In re Dickerson,* 222 F.3d 924, 926 (11th Cir.

2000), *petition for cert. filed,* Feb. 15, 2001 (disagreeing with *Tanner,* but concluding that it was bound by it "under the prior precedent rule").

This Court, however, is not bound by any of the cases that have weighed in on the matter. So what's really important here is whether the courts which supposedly have taken the "road less traveled" offer a persuasive reason for doing so. In the subsections which follow, we address each of the various arguments made by the "anti-modification" camp in support of its position.

### (i) The Dictum Argument

At least one court characterized *Nobelman's* discussion of § 506(a) as dictum. *See In re Barnes,* 207 B.R. 588, 592–93 (Bankr.N.D.Ill.1997). Accordingly, the court implies, it can properly be disregarded. *See id.* at 593 ("Our jurisprudence requires respect for a *clear ruling* by the United States Supreme Court." (emphasis added)). This argument is faulty on several levels.

Dictum is defined as "[a] judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case." Black's Law Dictionary (7th ed.1999) (defining "obiter dictum"). *See also, e.g., Kyle v. Office of Workers' Compensation Programs,* 819 F.2d 139, 143 (6th Cir.1987) (stating that a comment in a decision could "be viewed as dictum since it was not necessary to the court's holding"); *cf. McDonald,* 205 F.3d at 612 ("Chief Judge Posner has aptly defined dictum as 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding....' " (quoting *Sarnoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986))). The whole contro-

versy over *Nobelman* revolves around the question of whether the Court indeed held that § 1322(b)(2) takes precedence over § 506(a). *Compare, e.g., Bartee,* 212 F.3d at 286 *with, e.g., Barnes,* 207 B.R. at 593 (indicating that *Nobelman* held that "[f]or a debtor in Chapter 13, § 1322(b)(2) trumps § 506(a)") *and with American Gen. Fin. v. Dickerson,* 229 B.R. 539, 541 (M.D.Ga.1999), *rev'd, Dickerson,* 222 F.3d 924 (suggesting that *Nobelman* concluded that "Congress intended for § 1322(b)(2) to trump § 506(a) with respect to homestead liens"). If the Court did in fact so hold, then perhaps the § 506(a) passage could be characterized as dictum, on the theory that the passage concerned a statute which the Court (ultimately) deemed to be inapplicable.

If, on the other hand, the Court saw no conflict between these two statutes, then the § 506(a) passage is hardly dictum. To the contrary, one could argue under such circumstances that the passage was not only "necessary" to the Court's holding, but that it actually constituted a part of the holding. Thus the notion that the passage is dictum is plausible only if the "pro-modification" camp misinterpreted *Nobelman.* This would mean that the dictum argument is circular: It doesn't support the minority camp's thesis—i.e., that § 1322(b)(2) "trumps" § 506(a)—unless one accepts the thesis itself. *See McDonald,* 205 F.3d at 612 ("The Supreme Court's discussion [of § 506(a) ] is only dictum ... If you assume [the mortgagee's] ... reading of the case is correct at the outset.").

▮ Another problem with the dictum argument is that even dicta from the Supreme Court must be heeded by lower courts, at least where the Court's opinion is "considered" and clearly expressed. *See, e.g., Hrometz v. Local 550, Int'l Ass'n of Bridge Constr. & Ornamental Iron-*

*workers,* 227 F.3d 597, 602 (6th Cir.2000) ("Although the interpretation given [to a statute by the Supreme Court] ... is technically dicta, its import is clear and therefore binding upon this court. *See United States v. Oakar,* 111 F.3d 146, 153 (D.C.Cir.1997) ('Carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.' (citation and internal quotation marks omitted))."); *McDonald,* 205 F.3d at 612 (" '[B]eing peripheral, [dictum] may not have received the full and careful consideration of the court that uttered it.' ... [W]e should not idly ignore considered statements the Supreme Court makes in dicta." (quoting *Sarnoff,* 798 F.2d at 1084)). The dictum argument is, therefore, incomplete: A case must be made for the proposition that the supposed dictum is either unclear, or addresses a matter which did not receive the Court's full attention.

With respect to the latter point, it is hard to argue that the Court's comments concerning § 506(a) were made without due deliberation. *Nobelman,* after all, dealt explicitly and exclusively with the interplay of that statute with § 1322(b)(2). It therefore is reasonable to presume that the passage in question did not represent offhanded remarks. *Cf. id.* ("[T]he Supreme Court's discussion of § 506(a) was not likely to have been an ill-considered remark since the Fifth Circuit opinion that the Supreme Court reviewed expressly rejected [the assertion] that § 506(a) applies.").

Nor can the § 506(a) passage, considered in isolation, be fairly branded as unclear. The Court stated in relatively plain terms that the bank's claim could properly be subjected to valuation pursuant to § 506(a). Indeed, neither *Barnes* nor any of the other "minority" cases cited offered

a plausible alternative explanation as to the passage's meaning.[2]

Of course, the rationale for *Nobelman's* holding is not easily discerned—a fact to which the split among the cases cited herein readily attests. But this lack of clarity arises from the Court's failure to explain how its § 506(a) discussion corresponds with the opinion's other two sub-themes: (i) the emphasis on the mortgagee's state-law rights; and (ii) the interpretation of § 1322(b)(2)'s "other-than" clause. As far as it goes, each of these three portions of the *Nobelman* opinion is relatively clear. It is the lack of a unifying, overarching theme—a passage which ties up the opinion's disparate components—that makes *Nobelman* confusing.

In short, there is no sound basis for branding the § 506(a) passage as ill-considered or ambiguous. Even if the passage is dictum, then, this Court cannot simply disregard it.

Finally, the dictum argument misses the point. In this Court's view, the critical question is how *Nobelman* construed § 1322(b)(2)'s other-than clause. The Court's comments regarding § 506(a) are certainly relevant to that question, even if those comments can properly be labeled as dictum. *Cf. Timbers of Inwood Forest,* 484 U.S. at 371, 108 S.Ct. 626 (quoted *supra* p. 703). Thus the debate over whether this portion of the opinion was "necessary" is ultimately irrelevant.

For these reasons, the dictum argument is unimpressive.

**(ii) The Conflict Argument**

Many courts in the minority camp suggest that the majority view is incompatible with *Nobelman's* emphasis on the mortgagee's contractual rights under applicable state law. *See, e.g., Perry,* 235 B.R. at 607 ("Debtor's argument does not comport

---

2. At least one court made an effort to do so, reasoning that § 506(a) serves purposes other than that of facilitating the proposed modification of a mortgagee's claim:

> [S]ection 506(a) ... may be used to determine whether, prior to plan confirmation, a secured creditor is entitled to adequate protection. In *United Savings Association v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 ... (1988), the Supreme Court held that section 506(a) must be applied to determine if a creditor was oversecured and therefore entitled to post-petition, pre-confirmation interest as adequate protection. Also, collateral must be valued under section 506(a) to determine if certain fees and costs may be added to the secured claim. 11 U.S.C. § 506(b).

*In re Shandrew,* 210 B.R. 829, 831 n. 3 (Bankr.E.D.Cal.1997).

The functions identified in *Shandrew,* however, were not relevant to the issue at hand in *Nobelman.* It therefore seems unlikely that the Supreme Court was referring to these unrelated matters. And even if one accepts the rather dubious proposition that *Nobelman* was simply stating that a debtor's invocation

of § 506(a) is *generally* appropriate, there remains the question of why the Court deemed it worthwhile to note that the § 506(a) valuation demonstrated that the bank was "still the 'holder' of a 'secured claim.'" *Nobelman,* 508 U.S. at 329, 113 S.Ct. 2106. *Shandrew's* attempt to reconcile *Nobelman's* discussion of § 506(a) leaves that question unanswered.

The better view, then, is that the minority's construction of *Nobelman* provides no satisfactory explanation for this aspect of the Court's opinion. *See, e.g., In re Williams,* 161 B.R. 27, 29–30 (Bankr.E.D.Ky.1993) (*Nobelman's* statement that the debtors " 'were correct in looking to § 506(a)['] ... is meaningless unless some portion of the claim must be secured under § 506(a) analysis before the creditor is entitled to retain the rights it has under state law."); *see also In re McClurkin,* 31 F.3d 401, 406 (6th Cir.1994) (rejecting a mortgagee's argument that *"Nobelman* prohibits the ... bifurcati[on of] its claim under § 506(a)," reasoning that "[t]he Court simply held that § 1322(b)(2) prohibits confirming a reorganization plan which 'give[s] effect' to such bifurcation, *i.e.,* modifies the creditor's rights with respect to *either* the creditor's secured or unsecured claim components").

with the Supreme Court's focus on the rights of a creditor."); *Dickerson*, 229 B.R. at 543 ("[T]he majority view ... completely ignores *Nobelman's* emphasis on the existence of a lien rather than the presence of value in the" collateral.); *In re Barnes*, 199 B.R. 256, 257 (Bankr. W.D.N.Y.1996) (The debtor's "argument ... overlooks the reasoning of [*Nobelman*] ... that section 1322(b)(2) focuses upon 'rights' rather than claims."). But if one opts for the dependent-clause theory discussed above, those rights are in fact fully recognized—provided that the mortgagee's claim is at least partially secured per § 506(a). Thus there is no conflict here: The only question is whether the Court's discussion of contract rights applies to *all* mortgagees, or only those who can demonstrate that they hold a secured claim under § 506(a).[3]

Some courts also imply that the majority view is contrary to the intent behind § 1322(b)(2)—viz., "to encourage the flow of capital in the home lending market." *In re Neverla*, 194 B.R. 547, 550 (Bankr. W.D.N.Y.1996) (quoting *Nobelman*, 508 U.S. at 332, 113 S.Ct. 2106 (Stevens, J., concurring)). *See also, e.g., Perry*, 235 B.R. at 607–08; *In re Bauler*, 215 B.R. 628, 633 (Bankr.D.N.M.1997); *In re Fraize*, 208 B.R. 311, 313 (Bankr.D.N.H. 1997). But both the stand-alone and the dependent-clause theories would offer residential lenders more favorable treatment than would be the case were there no anti-modification clause. Thus the question boils down to just *how* "favorable" this treatment is to be, and resort to general statements of legislative intent is not helpful.

Accordingly, the minority cases are wrong insofar as they assert or suggest that the dependent-clause theory is irreconcilable with *Nobelman* or § 1322(b)(2)'s underlying purpose.

### (iii) The Absurdity Argument

With the dependent-clause theory, protection from modification is an all-or-nothing proposition. If the mortgagee's claim is supported by at least some value in the debtor's residence, then the entire claim is immune; If not, then the entire claim is vulnerable. The minority cases suggest that for this reason, the pro-modification camp's reading of *Nobelman* is untenable:

> Reliance on the "still the holder" dicta in *Nobelman* yields an absurd result. If § 1322(b)(2)'s protection against modification were limited solely to security interests with underlying collateral, junior mortgagees with a single penny of equity in collateral in the debtor's principal residence would still retain complete protection from a stripdown while junior mortgagees who lacked that penny of equity would find their entire claim stripped off.

*Barnes*, 207 B.R. at 593. *See also, e.g., Perry*, 235 B.R. at 607; *Dickerson*, 229 B.R. at 542–43; *Bauler*, 215 B.R. at 633; *In re Shandrew*, 210 B.R. 829, 832 (Bankr. E.D.Cal.1997); *In re Jones*, 201 B.R. 371, 374 (Bankr.D.N.J.1996); *Barnes*, 199 B.R. at 257–58.

In an effort to deflect this criticism, one majority case implied that *Barnes's* one-penny hypothetical is not particularly remarkable, as "[t]he code frequently protects, modifies, or abrogates important

---

**3.** In this regard, it is worth noting *Nobelman's* statement to the effect that a § 506(a) valuation which demonstrates that a mortgagee's claim is less than fully secured "does not *necessarily* mean that the [mortgagee's] 'rights' ... are limited by the valuation." *Nobelman*, 508 U.S. at 329, 113 S.Ct. 2106 (emphasis added). This passage suggests, of course, that the valuation *can* in some instances adversely affect such rights. Yet under the minority construction of *Nobelman*, mortgagee rights are absolutely inviolable.

rights based on property valuations." *Hornes*, 160 B.R. at 716. *See also Mann*, 249 B.R. at 838 ("[B]ankruptcy judges make distinctions of similar import in a variety of contexts.... 'Bright-line rules that use a seemingly arbitrary cut-off point are common in the law.'" (quoting *McDonald*, 205 F.3d at 613)). Another argued that "the fact that courts may be concerned with drawing sharp lines with harsh effects does not excuse the need for doing so." *Johnson v. Asset Mgmt. Group*, 226 B.R. 364, 369 (D.Md.1998).

These responses are not very compelling, as they beg the question of whether it would be irrational for Congress to permit the valuation to have consequences of the sort identified in *Barnes*. An affirmative answer to that question militates in favor of the minority's construction of *Nobelman*. *Cf. Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997) ("[A]bsent any 'indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it.'" (citations omitted)).

However, even if one accepts the premise that the majority's dichotomous approach is illogical, there remains the task of construing *Nobelman* in such a way as to eliminate that "absurdity" and yet also make sense of the opinion's § 506(a) passage. The minority cases offer no mode of analysis which achieves both of these objectives. In effect, then, the criticism in *Barnes* suggests that courts should prefer one absurdity (the Court didn't mean what it said with regard to § 506(a)) over another (the all-or-nothing consequences of as-

suming that the Court *did* mean what it said about § 506(a)).

There is another, more fundamental flaw in this argument. It implicitly assumes the feasability of a "middle ground"—i.e., that it is practical to protect from modification only that portion of a claim which is deemed secured after application of § 506(a). If it were otherwise, then the all-or-nothing approach could not fairly be characterized as absurd. This is so because, rather than giving up entirely and making all residential mortgage claims modification-proof, Congress might rationally conclude that some level of security (as determined by § 506(a)) must be established to qualify for § 1322(b)(2)'s protection. And whether the threshold is set at 100% (i.e., fully secured), or some lesser number, the theoretical "problem" identified by the minority cases remains the same: A one-penny difference in valuation could spell the difference between total protection from modification and no protection at all.[4]

Put differently, if one accepts the premise that it is not feasible to "give effect" to claim bifurcation, then it means that in deciding the scope of § 1322(b)(2)'s protection from modification, a choice must be made between protection that is over-inclusive (at least some undersecured claims are entirely immune) or under-inclusive (at least some such claims are entirely vulnerable). Faced with this choice, perhaps the fairest approach would be to "split the difference" by requiring that the claim be at least 50% secured under § 506(a) in order to qualify for protection from modification. It would not be absurd, however, for Congress to opt in favor of granting the full "windfall" to the mortgagees (as

4. This analysis assumes, of course, that Congress intended to deny protection from modification to the extent a claim is shown by the § 506(a) valuation to be unsecured. The mi-

nority cases do not suggest that this objective would be "absurd," nor is there any basis for such an assertion.

would be the upshot of the majority's construction of *Nobelman*) by requiring only that the claim be supported by *some* value. After all, as pointed out in *Nobelman* itself, "the legislative history indicat[es] that favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market." *Nobelman*, 508 U.S. at 332, 113 S.Ct. 2106 (Stevens, J., concurring). A mortgagee-slanted resolution of the dilemma outlined above would certainly promote this "flow of capital."

Some might not agree that it is impractical to tailor the scope of protection from modification to the size of the mortgagee's post-valuation secured claim. What matters here, though, is the fact that *Nobelman* quite clearly saw things differently:

> [W]e cannot discern how § 1322(b)(2) could be administered under [the debtors'] ... interpretation. [The debtors] ... propose to reduce the outstanding mortgage principal to the fair market value of the collateral, and, at the same time, they insist that they can do so without modifying the bank's rights "as to interest rates, payments amounts, and [other] contract terms." Brief for Petitioners 7. *That appears to be impossible.* The bank's contractual rights are contained in a unitary note that applies at once to the bank's overall claim, including both the secured and unsecured components. *[The debtors] ... cannot modify the payment and interest terms for the unsecured component, as they propose to do, without also modifying the terms of the secured component.* Thus, to preserve the interest rate and the amount of each monthly payment specified in the note after having reduced the principal to $23,500, the plan would also have to reduce the term of the note dramatically. That would be a significant modification of a contractual right. Furthermore, the bank holds an

adjustable rate mortgage, and the principal and interest payments on the loan must be recalculated with each adjustment in the interest rate. There is nothing in the mortgage contract or the Code that suggests any basis for recalculating the amortization schedule—whether by reference to the face value of the remaining principal or by reference to the unamortized value of the collateral. This conundrum alone indicates that § 1322(b)(2) cannot operate in combination with § 506(a) in the manner theorized by ... [the debtors].

> In other words, *to give effect to § 506(a)'s valuation and bifurcation of secured claims through a Chapter 13 plan in the manner [the debtors] ... propose would require a modification of the rights of the holder of the security interest.* Section 1322(b)(2) prohibits *such a modification* where, as here, the lender's claim is secured only by a lien on the debtor's principal residence.

*Nobelman*, 508 U.S. at 331–32, 113 S.Ct. 2106 (emphasis added).

So far as the Supreme Court was concerned, then, the very nature of the protection afforded by § 1322(b)(2) is "all or nothing": A creditor's claim cannot be "partially" subject to modification. Accepting that premise (as we should, since our goal is to accurately construe *Nobelman*), the dependent-clause theory—though biased in favor of mortgagees—does not represent an absurd policy choice.

### (iv) The Lack–of–Congressional–Response Argument

One of the stranger arguments in support of the minority position cites "the failure of Congress to redraft Section 1322(b)(2) after the *Nobelman* decision when it was fully aware of the controversy with regard to wholly unsecured Home-

stead Mortgages." *Neverla*, 194 B.R. at 552. As a general proposition, the notion that what Congress does (or does not do) can serve as a legitimate basis for establishing the meaning of a statute previously enacted by a different Congress is dubious. *See Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 117, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." (citations omitted); *Fletcher v. Housing Auth. of Louisville*, 525 F.2d 532, 535 (6th Cir.1975) ("Legislative action cannot . . . change ex post facto what was the intent of prior legislation.").

Leaving that question aside, however, we fail to see how Congress's non-response helps to resolve the "controversy." After all, it would have been just as easy for Congress to "redraft" § 1322(b)(2) in a manner which vindicated either camp's reading of *Nobelman* (or, for that matter, to opt for some third alternative). In this Court's view, then, Congress's post-*Nobelman* silence clarifies nothing.

### (v) The Claim–Secured Assumption

Some courts in the minority camp focus on the fact that § 1322(b)(2)'s other-than clause refers not to "a secured claim," but rather to a "claim secured." *See Bauler*, 215 B.R. at 632–33; *Dickerson*, 229 B.R. at 542. As already discussed, *Nobelman* likewise found this choice of phrases to be significant, and inferred therefrom that the clause relates to "the lienholder's entire claim, including both the secured and the unsecured components of the claim." *Nobelman*, 508 U.S. at 331, 113 S.Ct. 2106. The minority cases cited apparently believe that this basically settles the dispute: Since under *Nobelman* the clause encom-

passes post-valuation *unsecured* claims, it makes no difference whether there happens to be a corresponding, post-valuation *secured* claim.

In other words, these cases are implicitly assuming that the "independent clause" theory should prevail over the "dependent clause" theory. For reasons explained earlier, this assumption is unfounded.

### (vi) The Policy Arguments

 As courts are wont to do, the minority cases have articulated various theories as to why their interpretation of *Nobelman* makes for better social policy. The majority view, they argue, would encourage individuals contemplating bankruptcy to stop making payments on senior mortgages, in the hopes of dooming the junior mortgagee's secured status. *See, e.g., Shandrew*, 210 B.R. at 832 ("[T]o withhold the protection of section 1322(b)(2) from home mortgages unsupported by equity . . . would give a debtor an incentive to inflate senior liens by nonpayment and then file a chapter 13 petition when the senior lien exceeds the home's value."); *Jones*, 201 B.R. at 374; *Neverla*, 194 B.R. at 551. Their approach, they point out, offers the advantage of predictability, as application of the anti-modification clause would not be contingent on the outcome of the § 506(a) valuation. *See id.* at 552; *In re Perkins*, 237 B.R. 658, 660–61 (Bankr.S.D.Ohio 1999). One court also made the dubious assertion that the majority's approach would mean that confirmed chapter 13 plans could be undone based on "future fluctuations of the collateral market value." *Barnes*, 207 B.R. at 593.[5]

Cases in the majority have come up with policy arguments of their own. The First

---

**5.** The better view, and the law in this circuit, is that a chapter 13 debtor cannot modify a confirmed plan so as to reduce the amount of a secured claim based on post-confirmation depreciation in the collateral. *See In re Nolan*, 232 F.3d 528, 532–35 (6th Cir.2000).

Circuit Bankruptcy Appellate Panel, for example, reasoned: "Outside of bankruptcy, a lien with no collateral value cannot deliver any funds to the lienholder upon foreclosure. Such a lien should not deliver better rights in the bankruptcy court." *Mann,* 249 B.R. at 837–38. For its part, the Third Circuit asserted that "second mortgages are rarely used to purchase a home." *McDonald,* 205 F.3d at 613. Accordingly, "[t]he holder of a second mortgage is apt to be very much like other general creditors, and therefore it seems reasonable that a wholly unsecured second mortgage will be subject to the same rules that apply to other secured claims—i.e., a claim not secured by any current value in the specified collateral is deemed an unsecured claim." *Id.*

The important point here, though, is not which camp has the stronger policy arguments. Rather, what's significant is that there is no justification for the view (nor is anybody suggesting) that the various policy arguments are so one-sided that *Nobelman* could not possibly have meant what either the minority or the majority camp say it meant. *Cf. Dunn,* 519 U.S. at 470, 117 S.Ct. 913 (quoted *supra* p. 708). *But see American Textile Mfrs. Inst. v. The Limited, Inc.,* 190 F.3d 729, 738–39 (6th Cir.1999), *cert. denied,* 529 U.S. 1054, 120 S.Ct. 1556, 146 L.Ed.2d 461 (2000) (acknowledging that "a court may not allow policy considerations to trump the plain language of a statute," but indicating that it may take such considerations into account as a means of ascertaining Congress's intent with respect to an "ambiguous" statutory term). It therefore is inappropriate for lower-court judges to alter their reading of that case based solely on what they believe would be the most desirable outcome.

To summarize, this Court agrees with the Third Circuit that "the textual

arguments about *Nobelman* by themselves require" the conclusion that the anti-modification clause does not cover wholly unsecured mortgages. *McDonald,* 205 F.3d at 613. The cases which have held to the contrary are unpersuasive. Because the majority position represents the more logical interpretation of *Nobelman,* the Court adopts it.

Counsel for the Debtor shall submit an appropriate order.